## TEXAS *v.* COBB

No. 99–1702.  Argued January 16, 2001—Decided April 2, 2001

*Gregory S. Coleman,* Solicitor General of Texas, argued the cause for petitioner. With him on the briefs were *John Cornyn,* Attorney General, *Andy Taylor,* First Assistant Attorney General, and *S. Kyle Duncan,* Assistant Solicitor General.

*Lisa Schiavo Blatt* argued the cause for the United States as *amicus curiae* urging reversal. With her on the brief were *Solicitor General Waxman, Assistant Attorney Gen-*

*eral Robinson, Deputy Solicitor General Dreeben,* and *Deborah Watson.*

*Roy E. Greenwood,* by appointment of the Court, 531 U. S. 807, argued the cause for respondent. With him on the brief were *David A. Schulman* and *Lee Haidusek.*\*

CHIEF JUSTICE REHNQUIST delivered the opinion of the Court.

The Texas Court of Criminal Appeals held that a criminal defendant's Sixth Amendment right to counsel attaches not only to the offense with which he is charged, but to other offenses "closely related factually" to the charged offense. We hold that our decision in *McNeil* v. *Wisconsin,* 501 U. S. 171 (1991), meant what it said, and that the Sixth Amendment right is "offense specific."

In December 1993, Lindsey Owings reported to the Walker County, Texas, Sheriff's Office that the home he

---

\*Briefs of *amici curiae* urging reversal were filed for the State of Ohio et al. by *Betty D. Montgomery,* Attorney General of Ohio, *Edward B. Foley,* State Solicitor, *David M. Gormley,* Associate Solicitor, and *Elise W. Porter* and *Norman E. Plate,* Assistant Solicitors, and by the Attorneys General for their respective States as follows: *Bill Pryor* of Alabama, *Janet Napolitano* of Arizona, *Bill Lockyer* of California; *Ken Salazar* of Colorado, *John M. Bailey* of Connecticut, *Robert A. Butterworth* of Florida, *Carla J. Stovall* of Kansas, *Richard P. Ieyoub* of Louisiana, *Andrew Ketterer* of Maine, *Michael C. Moore* of Mississippi, *Joseph P. Mazurek* of Montana, *Don Stenberg* of Nebraska, *Frankie Sue Del Papa* of Nevada, *Philip T. McLaughlin* of New Hampshire, *W. A. Drew Edmondson* of Oklahoma, *D. Michael Fisher* of Pennsylvania, *Charles M. Condon* of South Carolina, *Mark Barnett* of South Dakota, *Mark L. Earley* of Virginia, and *Gay Woodhouse* of Wyoming; for the Criminal Justice Legal Foundation by *Kent S. Scheidegger* and *Charles L. Hobson;* and for the National Association of Police Organizations et al. by *Patrick F. Philbin* and *Stephen R. McSpadden.*

*Sheri Lynn Johnson* and *Jeffrey J. Pokorak* filed a brief for the National Association of Criminal Defense Lawyers et al. as *amici curiae* urging affirmance.

*Stephen G. Tipps* and *Jennifer L. Walker Elrod* filed a brief for the Texas District & County Attorneys Association et al. as *amici curiae.*

shared with his wife, Margaret, and their 16-month-old daughter, Kori Rae, had been burglarized. He also informed police that his wife and daughter were missing. Respondent Raymond Levi Cobb lived across the street from the Owings. Acting on an anonymous tip that respondent was involved in the burglary, Walker County investigators questioned him about the events. He denied involvement. In July 1994, while under arrest for an unrelated offense, respondent was again questioned about the incident. Respondent then gave a written statement confessing to the burglary, but he denied knowledge relating to the disappearances. Respondent was subsequently indicted for the burglary, and Hal Ridley was appointed in August 1994 to represent respondent on that charge.

Shortly after Ridley's appointment, investigators asked and received his permission to question respondent about the disappearances. Respondent continued to deny involvement. Investigators repeated this process in September 1995, again with Ridley's permission and again with the same result.

In November 1995, respondent, free on bond in the burglary case, was living with his father in Odessa, Texas. At that time, respondent's father contacted the Walker County Sheriff's Office to report that respondent had confessed to him that he killed Margaret Owings in the course of the burglary. Walker County investigators directed respondent's father to the Odessa police station, where he gave a statement. Odessa police then faxed the statement to Walker County, where investigators secured a warrant for respondent's arrest and faxed it back to Odessa. Shortly thereafter, Odessa police took respondent into custody and administered warnings pursuant to *Miranda* v. *Arizona,* 384 U. S. 436 (1966). Respondent waived these rights.

After a short time, respondent confessed to murdering both Margaret and Kori Rae. Respondent explained that when Margaret confronted him as he was attempting to re-

move the Owings' stereo, he stabbed her in the stomach with a knife he was carrying. Respondent told police that he dragged her body to a wooded area a few hundred yards from the house. Respondent then stated:

> "'I went back to her house and I saw the baby laying on its bed. I took the baby out there and it was sleeping the whole time. I laid the baby down on the ground four or five feet away from its mother. I went back to my house and got a flat edge shovel. That's all I could find. Then I went back over to where they were and I started digging a hole between them. After I got the hole dug, the baby was awake. It started going toward its mom and it fell in the hole. I put the lady in the hole and I covered them up. I remember stabbing a different knife I had in the ground where they were. I was crying right then.'" App. to Pet. for Cert. A–9 to A–10.

Respondent later led police to the location where he had buried the victims' bodies.

Respondent was convicted of capital murder for murdering more than one person in the course of a single criminal transaction. See Tex. Penal Code Ann. § 19.03(a)(7)(A) (1994). He was sentenced to death. On appeal to the Court of Criminal Appeals of Texas, respondent argued, *inter alia*, that his confession should have been suppressed because it was obtained in violation of his Sixth Amendment right to counsel. Relying on *Michigan* v. *Jackson*, 475 U. S. 625 (1986), respondent contended that his right to counsel had attached when Ridley was appointed in the burglary case and that Odessa police were therefore required to secure Ridley's permission before proceeding with the interrogation.

The Court of Criminal Appeals reversed respondent's conviction by a divided vote and remanded for a new trial. The court held that "once the right to counsel attaches to

the offense charged, it also attaches to any other offense that is very closely related factually to the offense charged." 2000 WL 275644, *3 (2000) (citations omitted). Finding the capital murder charge to be "factually interwoven with the burglary," the court concluded that respondent's Sixth Amendment right to counsel had attached on the capital murder charge even though respondent had not yet been charged with that offense. *Id.*, at *4. The court further found that respondent had asserted that right by accepting Ridley's appointment in the burglary case. See *ibid.* Accordingly, it deemed the confession inadmissible and found that its introduction had not been harmless error. See *id.*, at *4–*5. Three judges dissented, finding *Michigan* v. *Jackson* to be distinguishable and concluding that respondent had made a valid unilateral waiver of his right to counsel before confessing. See 2000 WL, at *5–*13 (opinion of McCormick, P. J.).

The State sought review in this Court, and we granted certiorari to consider first whether the Sixth Amendment right to counsel extends to crimes that are "factually related" to those that have actually been charged, and second whether respondent made a valid unilateral waiver of that right in this case. 530 U. S. 1260 (2000). Because we answer the first question in the negative, we do not reach the second.

The Sixth Amendment provides that "[i]n all criminal prosecutions, the accused shall enjoy the right . . . to have the Assistance of Counsel for his defence." In *McNeil* v. *Wisconsin*, 501 U. S. 171 (1991), we explained when this right arises:

> "The Sixth Amendment right [to counsel] . . . is offense specific. It cannot be invoked once for all future prosecutions, for it does not attach until a prosecution is commenced, that is, at or after the initiation of adversary judicial criminal proceedings—whether by way of formal charge, preliminary hearing, indictment, in-

formation, or arraignment." *Id.,* at 175 (citations and internal quotation marks omitted).

Accordingly, we held that a defendant's statements regarding offenses for which he had not been charged were admissible notwithstanding the attachment of his Sixth Amendment right to counsel on other charged offenses. See *id.,* at 176.

Some state courts and Federal Courts of Appeals, however, have read into *McNeil's* offense-specific definition an exception for crimes that are "factually related" to a charged offense.[1] Several of these courts have interpreted *Brewer* v. *Williams,* 430 U. S. 387 (1977), and *Maine* v. *Moulton,* 474 U. S. 159 (1985)—both of which were decided well before *McNeil*—to support this view, which respondent now invites us to approve. We decline to do so.

In *Brewer,* a suspect in the abduction and murder of a 10-year-old girl had fled from the scene of the crime in Des Moines, Iowa, some 160 miles east to Davenport, Iowa, where he surrendered to police. An arrest warrant was issued in Des Moines on a charge of abduction, and the suspect was arraigned on that warrant before a Davenport judge. Des Moines police traveled to Davenport, took the man into custody, and began the drive back to Des Moines. Along the way, one of the officers persuaded the suspect to lead police to the victim's body. The suspect ultimately was convicted of the girl's murder. This Court upheld the federal habeas court's conclusion that police had violated the suspect's Sixth Amendment right to counsel. We held that the officer's comments to the suspect constituted in-

---

[1] See, *e. g., United States* v. *Covarrubias,* 179 F. 3d 1219, 1223–1224 (CA9 1999); *United States* v. *Melgar,* 139 F. 3d 1005, 1013 (CA4 1998); *United States* v. *Doherty,* 126 F. 3d 769, 776 (CA6 1997); *United States* v. *Arnold,* 106 F. 3d 37, 41 (CA3 1997); *United States* v. *Williams,* 993 F. 2d 451, 457 (CA5 1993); *Commonwealth* v. *Rainwater,* 425 Mass. 540, 556, 681 N. E. 2d 1218, 1229 (1997); *In re Pack,* 420 Pa. Super. 347, 354–356, 616 A. 2d 1006, 1010–1011 (1992).

terrogation and that the suspect had not validly waived his right to counsel by responding to the officer. See 430 U. S., at 405–406.

Respondent suggests that *Brewer* implicitly held that the right to counsel attached to the factually related murder when the suspect was arraigned on the abduction charge. See Brief for Respondent 4. The Court's opinion, however, simply did not address the significance of the fact that the suspect had been arraigned only on the abduction charge, nor did the parties in any way argue this question. Constitutional rights are not defined by inferences from opinions which did not address the question at issue. Cf. *Hagans* v. *Lavine*, 415 U. S. 528, 535, n. 5 (1974) ("[W]hen questions of jurisdiction have been passed on in prior decisions *sub silentio*, this Court has never considered itself bound when a subsequent case finally brings the jurisdictional issue before us").

*Moulton* is similarly unhelpful to respondent. That case involved two individuals indicted for a series of thefts, one of whom had secretly agreed to cooperate with the police investigation of his codefendant, Moulton. At the suggestion of police, the informant recorded several telephone calls and one face-to-face conversation he had with Moulton during which the two discussed their criminal exploits and possible alibis. In the course of those conversations, Moulton made various incriminating statements regarding both the thefts for which he had been charged and additional crimes. In a superseding indictment, Moulton was charged with the original crimes as well as burglary, arson, and three additional thefts. At trial, the State introduced portions of the recorded face-to-face conversation, and Moulton ultimately was convicted of three of the originally charged thefts plus one count of burglary. Moulton appealed his convictions to the Supreme Judicial Court of Maine, arguing that introduction of the recorded conversation violated

his Sixth Amendment right to counsel. That court agreed, holding:

> " 'Those statements may be admissible in the investigation or prosecution of charges for which, at the time the recordings were made, adversary proceedings had not yet commenced. But as to the charges for which Moulton's right to counsel had already attached, his incriminating statements should have been ruled inadmissible at trial, given the circumstances in which they were acquired.' " 474 U. S., at 168 (quoting *State* v. *Moulton*, 481 A. 2d 155, 161 (1984)).

We affirmed.

Respondent contends that, in affirming reversal of both the theft and burglary charges, the *Moulton* Court must have concluded that Moulton's Sixth Amendment right to counsel attached to the burglary charge. See Brief for Respondent 13–14; see also Brief for the National Association of Criminal Defense Lawyers et al. as *Amici Curiae* 22–23. But the *Moulton* Court did not address the question now before us, and to the extent *Moulton* spoke to the matter at all, it expressly referred to the offense-specific nature of the Sixth Amendment right to counsel:

> "The police have an interest in the thorough investigation of crimes for which *formal charges* have already been filed. They also have an interest in investigating new or additional crimes. Investigations of either type of crime may require surveillance of individuals already under indictment. Moreover, law enforcement officials investigating an individual suspected of committing one crime and *formally charged* with having committed another crime obviously seek to discover evidence useful at a trial of either crime. In seeking evidence pertaining to *pending charges*, however, the Government's investigative powers are limited by the Sixth Amendment rights of the accused. . . . On the other hand, to exclude

evidence pertaining to charges as to which the Sixth Amendment right to counsel had not attached at the time the evidence was obtained, simply because other charges were pending at that time, would unnecessarily frustrate the public's interest in the investigation of criminal activities." 474 U. S., at 179–180 (emphasis added; footnote omitted).

See also *id.*, at 168 ("[T]he purpose of their meeting was to discuss the *pending charges*"); *id.*, at 177 ("[T]he police knew . . . that Moulton and [the informant] were meeting for the express purpose of discussing the *pending charges* . . ." (emphasis added)). Thus, respondent's reliance on *Moulton* is misplaced and, in light of the language employed there and subsequently in *McNeil,* puzzling.

Respondent predicts that the offense-specific rule will prove "disastrous" to suspects' constitutional rights and will "permit law enforcement officers almost complete and total license to conduct unwanted and uncounseled interrogations." Brief for Respondent 8–9. Besides offering no evidence that such a parade of horribles has occurred in those jurisdictions that have not enlarged upon *McNeil,* he fails to appreciate the significance of two critical considerations. First, there can be no doubt that a suspect must be apprised of his rights against compulsory self-incrimination and to consult with an attorney before authorities may conduct custodial interrogation. See *Miranda* v. *Arizona,* 384 U. S., at 479; *Dickerson* v. *United States,* 530 U. S. 428, 435 (2000) (quoting *Miranda*). In the present case, police scrupulously followed *Miranda*'s dictates when questioning respondent.[2] Second, it is critical to recognize that the Con-

[2] Curiously, while predicting disastrous consequences for the core values underlying the Sixth Amendment, see *post,* at 179–183 (opinion of BREYER, J.), the dissenters give short shrift to the Fifth Amendment's role (as expressed in *Miranda* and *Dickerson*) in protecting a defendant's right to consult with counsel before talking to police. Even though the Sixth Amendment right to counsel has not attached to uncharged offenses,

stitution does not negate society's interest in the ability of police to talk to witnesses and suspects, even those who have been charged with other offenses.

> "Since the ready ability to obtain uncoerced confessions is not an evil but an unmitigated good, society would be the loser. Admissions of guilt resulting from valid *Miranda* waivers 'are more than merely "desirable"; they are essential to society's compelling interest in finding, convicting, and punishing those who violate the law.'" *McNeil*, 501 U. S., at 181 (quoting *Moran* v. *Burbine*, 475 U. S. 412, 426 (1986)).

See also *Moulton, supra,* at 180 ("[T]o exclude evidence pertaining to charges as to which the Sixth Amendment right to counsel had not attached at the time the evidence was obtained, simply because other charges were pending at that time, would unnecessarily frustrate the public's interest in the investigation of criminal activities").

Although it is clear that the Sixth Amendment right to counsel attaches only to charged offenses, we have recog-

---

defendants retain the ability under *Miranda* to refuse any police questioning, and, indeed, charged defendants presumably have met with counsel and have had the opportunity to discuss whether it is advisable to invoke those Fifth Amendment rights. Thus, in all but the rarest of cases, the Court's decision today will have no impact whatsoever upon a defendant's ability to protect his Sixth Amendment right.

It is also worth noting that, contrary to the dissent's suggestion, see *post,* at 177–178, 179, there is no "background principle" of our Sixth Amendment jurisprudence establishing that there may be no contact between a defendant and police without counsel present. The dissent would expand the Sixth Amendment right to the assistance of counsel in a criminal prosecution into a rule which "'exists to prevent lawyers from taking advantage of uncounseled laypersons and to preserve the integrity of the lawyer-client relationship.'" *Post,* at 181 (quoting ABA Ann. Model Rule of Profesional Conduct 4.2 (4th ed. 1999)). Every profession is competent to define the standards of conduct for its members, but such standards are obviously not controlling in interpretation of constitutional provisions. The Sixth Amendment right to counsel is personal to the defendant and specific to the offense.

nized in other contexts that the definition of an "offense" is not necessarily limited to the four corners of a charging instrument. In *Blockburger* v. *United States,* 284 U. S. 299 (1932), we explained that "where the same act or transaction constitutes a violation of two distinct statutory provisions, the test to be applied to determine whether there are two offenses or only one, is whether each provision requires proof of a fact which the other does not." *Id.,* at 304. We have since applied the *Blockburger* test to delineate the scope of the Fifth Amendment's Double Jeopardy Clause, which prevents multiple or successive prosecutions for the "same offence." See, *e. g., Brown* v. *Ohio,* 432 U. S. 161, 164–166 (1977). We see no constitutional difference between the meaning of the term "offense" in the contexts of double jeopardy and of the right to counsel. Accordingly, we hold that when the Sixth Amendment right to counsel attaches, it does encompass offenses that, even if not formally charged, would be considered the same offense under the *Block-burger* test.[3]

While simultaneously conceding that its own test "lacks the precision for which police officers may hope," *post,* at 186, the dissent suggests that adopting *Blockburger*'s definition of "offense" will prove difficult to administer. But it is the dissent's vague iterations of the "'closely related to'" or "'inextricably intertwined with'" test, *post,* at 186, that would defy simple application. The dissent seems to presuppose that officers will possess complete knowledge of the circumstances surrounding an incident, such that the officers will be able to tailor their investigation to avoid addressing factually related offenses. Such an assumption, however, ignores the reality that police often are not yet aware of the

---

[3] In this sense, we could just as easily describe the Sixth Amendment as "prosecution specific," insofar as it prevents discussion of charged offenses as well as offenses that, under *Blockburger,* could not be the subject of a later prosecution. And, indeed, the text of the Sixth Amendment confines its scope to "all criminal *prosecutions.*"

exact sequence and scope of events they are investigating—indeed, that is why police must investigate in the first place. Deterred by the possibility of violating the Sixth Amendment, police likely would refrain from questioning certain defendants altogether.

It remains only to apply these principles to the facts at hand. At the time he confessed to Odessa police, respondent had been indicted for burglary of the Owings residence, but he had not been charged in the murders of Margaret and Kori Rae. As defined by Texas law, burglary and capital murder are not the same offense under *Blockburger.* Compare Tex. Penal Code Ann. § 30.02(a) (1994) (requiring entry into or continued concealment in a habitation or building) with § 19.03(a)(7)(A) (requiring murder of more than one person during a single criminal transaction). Accordingly, the Sixth Amendment right to counsel did not bar police from interrogating respondent regarding the murders, and respondent's confession was therefore admissible.

The judgment of the Court of Criminal Appeals of Texas is reversed.

*It is so ordered.*

JUSTICE KENNEDY, with whom JUSTICE SCALIA and JUSTICE THOMAS join, concurring.

The Court's opinion is altogether sufficient to explain why the decision of the Texas Court of Criminal Appeals should be reversed for failure to recognize the offense-specific nature of the Sixth Amendment right to counsel. It seems advisable, however, to observe that the Court has reached its conclusion without the necessity to reaffirm or give approval to the decision in *Michigan* v. *Jackson,* 475 U. S. 625 (1986). This course is wise, in my view, for the underlying theory of *Jackson* seems questionable.

As the facts of the instant case well illustrate, it is difficult to understand the utility of a Sixth Amendment rule that operates to invalidate a confession given by the free

choice of suspects who have received proper advice of their *Miranda* rights but waived them nonetheless. See *Miranda* v. *Arizona*, 384 U. S. 436 (1966). The *Miranda* rule, and the related preventative rule of *Edwards* v. *Arizona*, 451 U. S. 477 (1981), serve to protect a suspect's voluntary choice not to speak outside his lawyer's presence. The parallel rule announced in *Jackson*, however, supersedes the suspect's voluntary choice to speak with investigators. After *Jackson* had been decided, the Court made the following observation with respect to *Edwards:*

> "Preserving the integrity of an accused's choice to communicate with police only through counsel is the essence of *Edwards* and its progeny—not barring an accused from making an *initial* election as to whether he will face the State's officers during questioning with the aid of counsel, or go it alone. If an accused 'knowingly and intelligently' pursues the latter course, we see no reason why the uncounseled statements he then makes must be excluded at his trial." *Patterson* v. *Illinois*, 487 U. S. 285, 291 (1988).

There is little justification for not applying the same course of reasoning with equal force to the court-made preventative rule announced in *Jackson;* for *Jackson*, after all, was a wholesale importation of the *Edwards* rule into the Sixth Amendment.

In the instant case, Cobb at no time indicated to law enforcement authorities that he elected to remain silent about the double murder. By all indications, he made the voluntary choice to give his own account. Indeed, even now Cobb does not assert that he had no wish to speak at the time he confessed. While the *Edwards* rule operates to preserve the free choice of a suspect to remain silent, if *Jackson* were to apply it would override that choice.

There is further reason to doubt the wisdom of the *Jackson* holding. Neither *Miranda* nor *Edwards* enforces the

Fifth Amendment right unless the suspect makes a clear and unambiguous assertion of the right to the presence of counsel during custodial interrogation. *Davis* v. *United States*, 512 U. S. 452, 459 (1994). Where a required *Miranda* warning has been given, a suspect's later confession, made outside counsel's presence, is suppressed to protect the Fifth Amendment right of silence only if a reasonable officer should have been certain that the suspect expressed the unequivocal election of the right.

The Sixth Amendment right to counsel attaches quite without reference to the suspect's choice to speak with investigators after a *Miranda* warning. It is the commencement of a formal prosecution, indicated by the initiation of adversary judicial proceedings, that marks the beginning of the Sixth Amendment right. See *ante*, at 167–168 (quoting *McNeil* v. *Wisconsin*, 501 U. S. 171, 175 (1991)). These events may be quite independent of the suspect's election to remain silent, the interest which the *Edwards* rule serves to protect with respect to *Miranda* and the Fifth Amendment, and it thus makes little sense for a protective rule to attach absent such an election by the suspect. We ought to question the wisdom of a judge-made preventative rule to protect a suspect's desire not to speak when it cannot be shown that he had that intent.

Even if *Jackson* is to remain good law, its protections should apply only where a suspect has made a clear and unambiguous assertion of the right not to speak outside the presence of counsel, the same clear election required under *Edwards*. Cobb made no such assertion here, yet JUSTICE BREYER's dissent rests upon the assumption that the *Jackson* rule should operate to exclude the confession no matter. There would be little justification for this extension of a rule that, even in a more limited application, rests on a doubtful rationale.

JUSTICE BREYER defends *Jackson* by arguing that, once a suspect has accepted counsel at the commencement of ad-

versarial proceedings, he should not be forced to confront the police during interrogation without the assistance of counsel. See *post,* at 179–181. But the acceptance of counsel at an arraignment or similar proceeding only begs the question: acceptance of counsel for what? It is quite unremarkable that a suspect might want the assistance of an expert in the law to guide him through hearings and trial, and the attendant complex legal matters that might arise, but nonetheless might choose to give on his own a forthright account of the events that occurred. A court-made rule that prevents a suspect from even making this choice serves little purpose, especially given the regime of *Miranda* and *Edwards.*

With these further remarks, I join in full the opinion of the Court.

JUSTICE BREYER, with whom JUSTICE STEVENS, JUSTICE SOUTER, and JUSTICE GINSBURG join, dissenting.

This case focuses upon the meaning of a single word, "offense," when it arises in the context of the Sixth Amendment. Several basic background principles define that context.

First, the Sixth Amendment right to counsel plays a central role in ensuring the fairness of criminal proceedings in our system of justice. See *Gideon* v. *Wainwright,* 372 U. S. 335, 344 (1963); *Powell* v. *Alabama,* 287 U. S. 45, 57 (1932).

Second, the right attaches when adversary proceedings, triggered by the government's formal accusation of a crime, begin. See *Brewer* v. *Williams,* 430 U. S. 387, 401 (1977); *Kirby* v. *Illinois,* 406 U. S. 682, 689 (1972); *Massiah* v. *United States,* 377 U. S. 201, 206 (1964).

Third, once this right attaches, law enforcement officials are required, in most circumstances, to deal with the defendant through counsel rather than directly, even if the defendant has waived his Fifth Amendment rights. See *Michigan* v. *Jackson,* 475 U. S. 625, 633, 636 (1986) (waiver

of right to presence of counsel is assumed invalid unless accused initiates communication); *Maine* v. *Moulton*, 474 U. S. 159, 176 (1985) (Sixth Amendment gives defendant right "to rely on counsel as a 'medium' between him and the State"). Cf. ABA Model Rule of Professional Conduct 4.2 (2001) (lawyer is generally prohibited from communicating with a person known to be represented by counsel "about the subject of the representation" without counsel's "consent"); Green, A Prosecutor's Communications with Defendants: What Are the Limits?, 24 Crim. L. Bull. 283, 284, and n. 5 (1988) (version of Model Rule 4.2 or its predecessor has been adopted by all 50 States).

Fourth, the particular aspect of the right here at issue—the rule that the police ordinarily must communicate with the defendant through counsel—has important limits. In particular, recognizing the need for law enforcement officials to investigate "new or additional crimes" not the subject of current proceedings, *Maine* v. *Moulton, supra*, at 179, this Court has made clear that the right to counsel does not attach to any and every crime that an accused may commit or have committed, see *McNeil* v. *Wisconsin*, 501 U. S. 171, 175–176 (1991). The right "cannot be invoked once for all future prosecutions," and it does not forbid "interrogation unrelated to the charge." *Id.*, at 175, 178. In a word, as this Court previously noted, the right is "offense specific." *Id.*, at 175.

This case focuses upon the last-mentioned principle, in particular upon the meaning of the words "offense specific." These words appear in this Court's Sixth Amendment case law, not in the Sixth Amendment's text. See U. S. Const., Amdt. 6 (guaranteeing right to counsel "[i]n all criminal prosecutions"). The definition of these words is not self-evident. Sometimes the term "offense" may refer to words that are written in a criminal statute; sometimes it may refer generally to a course of conduct in the world, aspects of which constitute the elements of one or more crimes; and

sometimes it may refer, narrowly and technically, just to the conceptually severable aspects of the latter. This case requires us to determine whether an "offense"—for Sixth Amendment purposes—includes factually related aspects of a single course of conduct other than those few acts that make up the essential.elements of the crime charged.

We should answer this question in light of the Sixth Amendment's basic objectives as set forth in this Court's case law. At the very least, we should answer it in a way that does not undermine those objectives. But the Court today decides that "offense" means the crime set forth within "the four corners of a charging instrument," along with other crimes that "would be considered the same offense" under the test established by *Blockburger* v. *United States*, 284 U. S. 299 (1932). *Ante*, at 173. In my view, this unnecessarily technical definition undermines Sixth Amendment protections while doing nothing to further effective law enforcement.

For one thing, the majority's rule, while leaving the Fifth Amendment's protections in place, threatens to diminish severely the additional protection that, under this Court's rulings, the Sixth Amendment provides when it grants the right to counsel to defendants who have been charged with a crime and insists that law enforcement officers thereafter communicate with them through that counsel. See, e. g., *Michigan* v. *Jackson*, *supra*, at 632 (Sixth Amendment prevents police from questioning represented defendant through informants even when Fifth Amendment would not); *Rhode Island* v. *Innis*, 446 U. S. 291, 300, n. 4 (1980) (Fifth Amendment right, unlike Sixth, applies only in custodial interrogation).

JUSTICE KENNEDY, JUSTICE SCALIA, and JUSTICE THOMAS, if not the majority, apparently believe these protections constitutionally unimportant, for, in their view, "the underlying theory of *Jackson* seems questionable." *Ante*, at 174 (KENNEDY, J., concurring). Both the majority and

concurring opinions suggest that a suspect's ability to invoke his Fifth Amendment right and "refuse any police questioning" offers that suspect adequate constitutional protection. *Ante,* at 172, n. 2 (majority opinion); see also *ante,* at 175–176 (KENNEDY, J., concurring). But that is not so.

*Jackson* focuses upon a suspect—perhaps a frightened or uneducated suspect—who, hesitant to rely upon his own unaided judgment in his dealings with the police, has invoked his constitutional right to legal assistance in such matters. See *Michigan* v. *Jackson,* 475 U. S., at 634, n. 7 (" 'The simple fact that [a] defendant has requested an attorney indicates that he does not believe that he is sufficiently capable of dealing with his adversaries singlehandedly' ") (quoting *People* v. *Bladel,* 421 Mich. 39, 63–64, 365 N. W. 2d 56, 67 (1984)). *Jackson* says that, once such a request has been made, the police may not simply throw that suspect—who does not trust his own unaided judgment—back upon his own devices by requiring him to rely for protection upon that same unaided judgment that he previously rejected as inadequate. In a word, the police may not force a suspect who has asked for legal counsel to make a critical legal choice without the legal assistance that he has requested and that the Constitution guarantees. See *McNeil* v. *Wisconsin, supra,* at 177–178 ("The purpose of the Sixth Amendment counsel guarantee . . . is to 'protec[t] the unaided layman at critical confrontations' with his 'expert adversary' ") (quoting *United States* v. *Gouveia,* 467 U. S. 180, 189 (1984)). The Constitution does not take away with one hand what it gives with the other. See *Gideon* v. *Wainwright,* 372 U. S., at 344 (Sixth Amendment means that a person charged with a crime need not "face his accusers without a lawyer to assist him"); *Michigan* v. *Jackson, supra,* at 633, 635 (presuming "that the defendant requests the lawyer's services at every critical stage of the prosecution" even if the defendant fails to invoke his Fifth Amendment rights at the time of interrogation); cf. *Edwards* v. *Arizona,* 451 U. S. 477, 484–485 (1981) (when

accused has expressed desire to deal with police through counsel, police may not reinitiate interrogation until counsel has been made available); ABA Ann. Model Rule of Professional Conduct 4.2, p. 398, comment. (4th ed. 1999) ("Rule 4.2 . . . exists to prevent lawyers from taking advantage of uncounseled laypersons and to preserve the integrity of the lawyer-client relationship").

For these reasons, the Sixth Amendment right at issue is independent of the Fifth Amendment's protections; and the importance of this Sixth Amendment right has been repeatedly recognized in our cases. See, e. g., *Michigan* v. *Jackson, supra,* at 636 ("We conclude that the assertion [of the right to counsel] is no less significant, and the need for additional safeguards no less clear, when the request for counsel is made at an arraignment and when the basis for the claim is the Sixth Amendment").

JUSTICE KENNEDY primarily relies upon *Patterson* v. *Illinois,* 487 U. S. 285 (1988), in support of his conclusion that *Jackson* is not good law. He quotes *Patterson*'s statement that the Constitution does " 'not ba[r] an accused from making an *initial* election as to whether' " to speak with the police without counsel's assistance. *Ante,* at 175 (quoting *Patterson* v. *Illinois, supra,* at 291).

This statement, however, cannot justify the overruling of *Jackson.* That is because, in *Patterson* itself, this Court noted, "as a matter of some significance," that, at the time he was interrogated, *the defendant had neither retained nor accepted the appointment of counsel.* 487 U. S., at 290, n. 3. We characterized our holding in *Jackson* as having depended upon "the fact that the accused 'ha[d] asked for the help of a lawyer' in dealing with the police," 487 U. S., at 291 (quoting *Michigan* v. *Jackson, supra,* at 631), and explained that, "[o]nce an accused has a lawyer, a distinct set of constitutional safeguards aimed at preserving the sanctity of the attorney-client relationship takes effect," 487 U. S., at 290, n. 3 (citing *Maine* v. *Moulton,* 474 U. S., at 176).

JUSTICE KENNEDY also criticizes *Jackson* on the ground that it prevents a suspect "from . . . making th[e] choice" to "give . . . a forthright account of the events that occurred." *Ante*, at 177. But that is not so. A suspect may initiate communication with the police, thereby avoiding the risk that the police induced him to make, unaided, the kind of critical legal decision best made with the help of counsel, whom he has requested.

Unlike JUSTICE KENNEDY, the majority does not call *Jackson* itself into question. But the majority would undermine that case by significantly diminishing the Sixth Amendment protections that the case provides. That is because criminal codes are lengthy and highly detailed, often proliferating "overlapping and related statutory offenses" to the point where prosecutors can easily "spin out a startlingly numerous series of offenses from a single . . . criminal transaction." *Ashe* v. *Swenson*, 397 U. S. 436, 445, n. 10 (1970). Thus, an armed robber who reaches across a store counter, grabs the cashier, and demands "your money or your life," may through that single instance of conduct have committed several "offenses," in the majority's sense of the term, including armed robbery, assault, battery, trespass, use of a firearm to commit a felony, and perhaps possession of a firearm by a felon, as well. A person who is using and selling drugs on a single occasion might be guilty of possessing various drugs, conspiring to sell drugs, being under the influence of illegal drugs, possessing drug paraphernalia, possessing a gun in relation to the drug sale, and, depending upon circumstances, violating various gun laws as well. A protester blocking an entrance to a federal building might also be trespassing, failing to disperse, unlawfully assembling, and obstructing Government administration all at one and the same time.

The majority's rule permits law enforcement officials to question those charged with a crime without first approaching counsel, through the simple device of asking questions about any other related crime not actually charged in

the indictment. Thus, the police could ask the individual charged with robbery about, say, the assault of the cashier not yet charged, or about any other uncharged offense (unless under *Blockburger*'s definition it counts as the "same crime"), all *without notifying counsel*. Indeed, the majority's rule would permit law enforcement officials to question anyone charged with any crime in any one of the examples just given about his or her conduct on the single relevant occasion without notifying counsel unless the prosecutor has charged every possible crime arising out of that same brief course of conduct. What Sixth Amendment sense—what common sense—does such a rule make? What is left of the "communicate through counsel" rule? The majority's approach is inconsistent with any common understanding of the scope of counsel's representation. It will undermine the lawyer's role as "'medium'" between the defendant and the government. *Maine* v. *Moulton, supra,* at 176. And it will, on a random basis, remove a significant portion of the protection that this Court has found inherent in the Sixth Amendment.

In fact, under the rule today announced by the majority, two of the seminal cases in our Sixth Amendment jurisprudence would have come out differently. In *Maine* v. *Moulton*, which the majority points out "expressly referred to the offense-specific nature of the Sixth Amendment right to counsel," *ante,* at 170, we treated burglary and theft as the same offense for Sixth Amendment purposes. Despite the opinion's clear statement that "[i]ncriminating statements pertaining to other crimes, as to which the Sixth Amendment right has not yet attached, are, of course, admissible at a trial of those offenses," 474 U. S., at 180, n. 16, the Court affirmed the lower court's reversal of both burglary and theft charges even though, at the time that the incriminating statements at issue were made, Moulton had been charged only with theft by receiving, *id.,* at 162, 167, 180. Under the majority's rule, in contrast, because theft by re-

ceiving and burglary each required proof of a fact that the other did not, only Moulton's theft convictions should have been overturned. Compare Me. Rev. Stat. Ann., Tit. 17–A, § 359 (1981) (theft) (requiring knowing receipt, retention, or disposal of stolen property with the intent to deprive the owner thereof), with § 401 (burglary) (requiring entry of a structure without permission and with the intent to commit a crime).

In *Brewer* v. *Williams*, the effect of the majority's rule would have been even more dramatic. Because first-degree murder and child abduction each required proof of a fact not required by the other, and because at the time of the impermissible interrogation Williams had been charged only with abduction of a child, Williams' murder conviction should have remained undisturbed. See 430 U. S., at 390, 393–395, 406. Compare Iowa Code § 690.2 (1950 and Supp. 1978) (first-degree murder) (requiring a killing) with Iowa Code § 706.2 (1950) (repealed 1978) (child-stealing) (requiring proof that a child under 16 was taken with the intent to conceal the child from his or her parent or guardian). This is not to suggest that this Court has previously addressed and decided the question presented by this case. Rather, it is to point out that the Court's conception of the Sixth Amendment right at the time that *Moulton* and *Brewer* were decided naturally presumed that it extended to factually related but uncharged offenses.

At the same time, the majority's rule threatens the legal clarity necessary for effective law enforcement. That is because the majority, aware that the word "offense" ought to encompass something beyond "the four corners of the charging instrument," imports into Sixth Amendment law the definition of "offense" set forth in *Blockburger* v. *United States*, 284 U. S. 299 (1932), a case interpreting the Double Jeopardy Clause of the Fifth Amendment, which Clause uses the word "offence" but otherwise has no relevance here. Whatever Fifth Amendment virtues *Block-*

*burger* may have, to import it into this Sixth Amendment context will work havoc.

In theory, the test says that two offenses are the "same offense" unless each requires proof of a fact that the other does not. See *ante*, at 173 (majority opinion). That means that most of the different crimes mentioned above are not the "same offense." Under many States' laws, for example, the statute defining assault and the statute defining robbery each requires proof of a fact that the other does not. Compare, *e. g.*, Cal. Penal Code Ann. § 211 (West 1999) (robbery) (requiring taking of personal property of another) with § 240 (assault) (requiring attempt to commit violent injury). Hence the extension of the definition of "offense" that is accomplished by the use of the *Blockburger* test does nothing to address the substantial concerns about the circumvention of the Sixth Amendment right that are raised by the majority's rule.

But, more to the point, the simple-sounding *Blockburger* test has proved extraordinarily difficult to administer in practice. Judges, lawyers, and law professors often disagree about how to apply it. See, *e. g.*, *United States* v. *Woodward*, 469 U. S. 105, 108 (1985) *(per curiam)* (holding that lower court misapplied *Blockburger* test). Compare *United States* v. *Dixon*, 509 U. S. 688, 697–700 (1993) (opinion of SCALIA, J.) (applying *Blockburger* and concluding that contempt is same offense as underlying substantive crime), with 509 U. S., at 716–720 (REHNQUIST, C. J., concurring in part and dissenting in part) (applying *Blockburger* and deciding that the two are separate offenses). The test has emerged as a tool in an area of our jurisprudence that THE CHIEF JUSTICE has described as "a veritable Sargasso Sea which could not fail to challenge the most intrepid judicial navigator." *Albernaz* v. *United States*, 450 U. S. 333, 343 (1981). Yet the Court now asks, not the lawyers and judges who ordinarily work with double jeopardy law, but police officers in the field, to navigate *Blockburger* when they ques-

tion suspects. Cf. *New York* v. *Belton,* 453 U. S. 454, 458 (1981) (noting importance of clear rules to guide police behavior). Some will apply the test successfully; some will not. Legal challenges are inevitable. The result, I believe, will resemble not so much the Sargasso Sea as the criminal law equivalent of Milton's "Serbonian Bog . . . Where Armies whole have sunk."

There is, of course, an alternative. We can, and should, define "offense" in terms of the conduct that constitutes the crime that the offender committed on a particular occasion, including criminal acts that are "closely related to" or "inextricably intertwined with" the particular crime set forth in the charging instrument. This alternative is not perfect. The language used lacks the precision for which police officers may hope; and it requires lower courts to specify its meaning further as they apply it in individual cases. Yet virtually every lower court in the United States to consider the issue has defined "offense" in the Sixth Amendment context to encompass such closely related acts. See *ante,* at 168, n. 1 (majority opinion) (citing cases from the Third, Fourth, Fifth, Sixth, and Ninth Circuits as well as state courts in Massachusetts and Pennsylvania); *Taylor* v. *State,* 726 So. 2d 841, 845 (Fla. App. 1999); *People* v. *Clankie,* 124 Ill. 2d 456, 462–466, 530 N. E. 2d 448, 451–453 (1988); *State* v. *Tucker,* 137 N. J. 259, 277–278, 645 A. 2d 111, 120–121 (1994), cert. denied, 513 U. S. 1090 (1995). These courts have found offenses "closely related" where they involved the same victim, set of acts, evidence, or motivation. See, *e. g., Taylor* v. *State, supra,* at 845 (stolen property charges and burglary); *State* v. *Tucker, supra,* at 278, 645 A. 2d, at 121 (burglary, robbery, and murder of home's occupant); *In re Pack,* 420 Pa. Super. 347, 355–356, 616 A. 2d 1006, 1010 (1992) (burglary, receiving stolen property, and theft charges), appeal denied, 535 Pa. 669, 634 A. 2d 1117 (1993). They have found offenses unrelated where time, location, or factual circumstances significantly separated the

one from the other. See, *e. g., Commonwealth* v. *Rainwater,* 425 Mass. 540, 547–549, and n. 7, 681 N. E. 2d 1218, 1224, and n. 7 (1997) (vehicle theft charge and earlier vehicle thefts in same area), cert. denied, 522 U. S. 1095 (1998); *Whittlesey* v. *State,* 340 Md. 30, 56–57, 665 A. 2d 223, 236 (1995) (murder and making false statements charges), cert. denied, 516 U. S. 1148 (1996); *People* v. *Dotson,* 214 Ill. App. 3d 637, 646, 574 N. E. 2d 143, 149 (murder and weapons charges), appeal denied, 141 Ill. 2d 549, 580 N. E. 2d 123 (1991).

One cannot say in favor of this commonly followed approach that it is perfectly clear—only that, because it comports with common sense, it is far easier to apply than that of the majority. One might add that, unlike the majority's test, it is consistent with this Court's assumptions in previous cases. See *Maine* v. *Moulton,* 474 U. S., at 162, 167, 180 (affirming reversal of both burglary and theft convictions); *Brewer* v. *Williams,* 430 U. S., at 389, 390, 393, 406 (affirming grant of habeas which vacated murder conviction). And, most importantly, the "closely related" test furthers, rather than undermines, the Sixth Amendment's "right to counsel," a right so necessary to the realization in practice of that most "noble ideal," a fair trial. *Gideon* v. *Wainwright,* 372 U. S., at 344.

The Texas Court of Criminal Appeals, following this commonly accepted approach, found that the charged burglary and the uncharged murders were "closely related." All occurred during a short period of time on the same day in the same basic location. The victims of the murders were also victims of the burglary. Cobb committed one of the murders in furtherance of the robbery, the other to cover up the crimes. The police, when questioning Cobb, knew that he already had a lawyer representing him on the burglary charges and had demonstrated their belief that this lawyer also represented Cobb in respect to the murders by asking his permission to question Cobb about the murders on previous occasions. The relatedness of the crimes

is well illustrated by the impossibility of questioning Cobb about the murders without eliciting admissions about the burglary. See, *e. g.,* Tr. 157 (Feb. 19, 1997) (testimony by police officer who obtained murder confession) ("Basically what he told us is he had gone over to the house to burglarize it and nobody was home"); 22 Record, State's Exh. 20 (typed statement by Cobb) (admitting that he committed the murders after entering the house and stealing stereo parts). Nor, in my view, did Cobb waive his right to counsel. See *supra,* at 180–181. These considerations are sufficient. The police officers ought to have spoken to Cobb's counsel before questioning Cobb. I would affirm the decision of the Texas court.

Consequently, I dissent.