

2005 Decisions

Opinions of the United
States Court of Appeals
for the Third Circuit

3-8-2005

# USA v. Paz

Precedential or Non-Precedential: Non-Precedential

Docket No. 04-1156

Follow this and additional works at: http://digitalcommons.law.villanova.edu/thirdcircuit_2005

Recommended Citation

"USA v. Paz" (2005). *2005 Decisions.* Paper 1467.
http://digitalcommons.law.villanova.edu/thirdcircuit_2005/1467

This decision is brought to you for free and open access by the Opinions of the United States Court of Appeals for the Third Circuit at Villanova
University School of Law Digital Repository. It has been accepted for inclusion in 2005 Decisions by an authorized administrator of Villanova
University School of Law Digital Repository. For more information, please contact Benjamin.Carlson@law.villanova.edu.

<u>**NOT PRECEDENTIAL**</u>

UNITED STATES COURT OF APPEALS
FOR THE THIRD CIRCUIT

Nos. 04-1156 & 04-1809

UNITED STATES OF AMERICA

v.

NICHOLAS PAZ,

Appellant

ON APPEAL FROM THE UNITED STATES DISTRICT COURT FOR THE
EASTERN DISTRICT OF PENNSYLVANIA

(Dist. Court No. 02-cr-00441-1)
District Court Judge: Honorable Cynthia M. Rufe

(Dist. Court No. 03-cr-00629-1)
District Court Judge: Honorable James T. Giles, C.J.

Submitted pursuant to LAR 34.1(a)
January 18, 2005

Before: ALITO, McKEE, and SMITH, <u>Circuit Judges</u>.

(Opinion Filed: March 8, 2005)

OPINION OF THE COURT

PER CURIAM:

Defendant Nicholas Paz was convicted in one criminal case for bank robbery and in another for witness tampering. These two cases were consolidated for purposes of appeal because Paz's sentence in the bank robbery case was approximately 13 years longer than it might have been had he not been convicted in the witness tampering case. As we write for the parties only, we will not set out the facts. For the reasons set out below, we find Paz's claims to be without merit and affirm the two judgments.

## I.

We review the District Courts' factual findings for clear error, and we exercise plenary review of the District Courts' application of the law to those facts. See United States v. Perez, 280 F.3d 318, 336 (3d Cir. 2002) (standard for motion to suppress); United States v. Inigo, 925 F.2d 641, 656 (3d Cir. 1991) (standard for claim of privilege); United States v. Nolan-Cooper, 155 F.3d 221, 229 (3d Cir. 1998) (standard for motion to dismiss indictment). We review a District Court's evidentiary rulings for abuse of discretion. United States v. Givan, 320 F.3d 452, 460 (3d Cir. 2003).

## II.

The Sixth Amendment is "offense specific" in that it attaches only to the specific offense that has been formally charged. Texas v. Cobb, 532 U.S. 162, 167-168 (2001). The Sixth Amendment cannot be invoked for all future prosecutions of any offense whatsoever, nor does it attach until a prosecution is commenced. Id. Even if an

2

uncharged crime is factually related to a charged crime, if the uncharged crime is distinct, meaning that it requires proof of some element that the other crime does not, the Sixth Amendment will not attach. Id. at 173. For this reason the FBI did not violate Paz's Sixth Amendment rights when it interviewed Paz outside the presence of a defense lawyer regarding a possible obstruction of justice. The interview occurred on February 19, 2003, almost a month before Paz was charged with witness tampering, and Paz had not retained a lawyer to defend him against charges of obstruction of justice or witness tampering.

Paz's contention that his statements on February 19, 2003, were protected by the proffer agreement entered into on May 31, 2002, is unavailing. He terminated any protections he had under the 2002 agreement when he knowingly and freely signed a Miranda waiver after being advised of his Miranda rights in oral and written form — all of which was preceded by the FBI agents' express declaration that they had not come to talk about the credit union robbery, but to investigate a potential obstruction of justice. Nor can Paz argue that he did not know what he was doing when he signed the Miranda waiver; he testified that he was familiar with Miranda warnings, that he had previously refused to sign a Miranda waiver (when he was first arrested for robbing the Credit Union), and that he fully understood that anything he said at the February 19, 2003, interview could be used against him in court. Finally, the circumstances of the February 19, 2003, interview differed from Paz's previous three proffers in ways that should have made Paz aware his proffer agreement would not protect his statements in the February

3

19, 2003, interview. All of the previous proffers took place at the William J. Green Federal Building, but the February 19, 2003, interview took place at the Federal Detention Center. Paz did not receive <u>Miranda</u> warnings at any of the previous proffers, but on February 19, 2003, he did. Before, Paz's counsel in the bank robbery case and the case agent in that matter, Agent Rosselli, had always been present — but not on February 19, 2003. And two agents who had not been at the previous proffers attended the February 19, 2003, interview.

## III.

The government did not violate Pennsylvania Rule of Professional Conduct 4.2, which concerns communications with persons represented by counsel, when agents interviewed Paz on February 19, 2003. The purpose of that interview was to investigate a possible obstruction of justice, and Paz was not represented by counsel for such purposes at the time.

## IV.

Paz asserts that materials from his attorney's file were protected by the attorney-client and work-product privileges and should not have been admitted into evidence. The only document at issue is one page of Daniel Seal's handwritten notes. Because Paz attempted to use his relationship with Seal to further an ongoing crime, his statements to Seal about, and Seal's work-product concerning, the ongoing crime are not protected by any privilege. See <u>Haines v. Liggett Group, Inc.</u>, 975 F.2d 81, 95 (3d Cir. 1992)

(attorney-client privilege is waived when client uses the attorney-client relationship to engage in an ongoing crime or fraud or to plan a future crime or fraud); In re Impounded Case (Law Firm), 879 F.2d 1211, 1214 (3d Cir. 1989) (crime-fraud exception also applies to materials otherwise protected by the work-product privilege).

To invoke the crime-fraud exception, the government must make a two-part showing. First, the government must make a prima facie showing that reasonably suggests the defendant was engaging or intended to engage in criminal conduct at the time of the attorney-client communication. Second, the government must show that the attorney-client communications were related to this continuing or intended criminal activity. See In re Grand Jury Subpoena, 223 F.3d 213, 217 (3d Cir. 2000); see also In re Grand Jury Subpoena, 604 F.2d 798, 803 (3d Cir. 1979) (on the issue of timing). The content of any contested communications can be considered to determine whether the crime-fraud exception applies. See United States v. Zolin, 491 U.S. 554, 556-557(1989).

The evidence at trial established that Seal, at the direction of Paz, had urged Clanton to lie to the government. The evidence showed that Seal met with Paz three times: on July 1, 2002, August 6, 2002, and December 19, 2002. At the first meeting, Seal presented Clanton with a note containing the signature of Paz and encouraging Clanton "to do his part." On or about July 9, 2002, Clanton received a letter from Paz further encouraging him to go along with Paz's plan to lie to the government in the hope of obtaining a reduced sentence. Based on this evidence, the District Court did not err by

5

finding that Seal's notes of his meeting with Clanton, a portion of which was shown to Clanton, fell under the crime-fraud exception to the attorney-client and work-product privileges. Accordingly, the District Court was right to conclude that no privilege applied and that the one-page document was admissible.

## V.

Paz asserts that Clanton should not have been permitted to testify as to his understanding of the phrase "do a Frank Hannon on Ligambi," which was contained in a letter Paz sent Clanton. Specifically, Paz asserts that Clanton's testimony as to the meaning of the phrase was not relevant. But relevance is not a difficult condition to satisfy under the Federal Rules of Evidence. Under Rule 401, evidence is relevant if it has "any tendency" to make more probable "any fact that is of consequence to the determination of the action." Clanton's testimony therefore easily satisfies Rule 401. His understanding of what the phrase meant was probative of what Paz intended to say, and thus of whether Paz meant to persuade Clanton to lie to the government. Nor was there any undue prejudice to Paz on this matter, as counsel for Paz was free to (and did) cross-examine Clanton as to the accuracy of Clanton's understanding of the phrase.

## VI.

In FBI Agent Jeffrey Huber's testimony before the second grand jury in the witness tampering case, he did not mention any details about the July 30, 2002, proffer. Huber testified only that, during an interview on February 19, 2003, and after a signed

waiver of rights, Paz said he participated in a proffer regarding a drug deal with Joseph

Ligambi:

> Q:   [D]id you actually interview Nicholas Paz about six months ago?
> A:   Yes, February 19, 2003.
> Q:   And did he tell you during that interview that — at a proffer that he participated in, a proffer about a drug deal with Ligambi?
> A:   Yeah, he did.
> Q:   And so one of his proffers occurred on July 30[,] [2002]?
> A:   Correct.

App. 290.  That Paz said such things at the February 19, 2003, interview was properly

before the grand jury in order to establish the background for the witness tampering; it

illustrates that Paz told the government his Ligambi story at a time when he was seeking

leniency from the prosecution on the bank robbery charges, and it helps establish why Paz

would want Clanton to support the Ligambi story.

Agent Huber also testified, in response to a grand juror's question, that Paz

participated in three proffer sessions, each with a different subject:

> GRAND JUROR:   I thought I heard multiple proffers in there.
> BY MS. WOLF:
> Q:   How many proffers did Nicholas Paz participate in?
> A:   I believe there were approximately three proffers.  And the reason there was multiple is a lot of the time they'll have the proffer session regarding the bank robbery, the crime at hand that they were charged with, then there were other bank robbers [sic] that Nicholas Paz might not have been charged with but he talked about.  And as well as the time they talked about the Joe Ligambi drug deal story, the FBI sometimes separates these in order of the different subjects.

App. 317.

Once again, Agent Huber did not tell the grand jury any statements by Paz that

7

were protected by a proffer agreement.  The transcript does not even support the claim that Agent Huber was <u>attempting</u> to sneak in any protected statements.  His statement was an on-point response to a grand juror's question and merely explained why the multiple proffers did not make the case unusual or especially significant.  Furthermore, and contrary to Paz's complaint, this testimony does not amount to Huber's telling the grand jury that Paz "admitted to being a serial bank robber."  At all events, the government's multiple instructions to the grand jury that it should not focus on bank robbery, but on witness tampering, were more than sufficient to cure whatever undue prejudice might have resulted from Huber's brief reference to the bank robberies.

For the above reasons, we affirm.