LFOGG, Judge.
This case is before us on remand from the Louisiana Supreme Court.
Relator, Simon Hutchinson, and Perry Pooler were charged with four counts of first degree murder. Relator thereafter filed a motion to suppress a taped confession he gave to the police. Following a suppression hearing, the district court denied the motion, without reasons. Relator filed a writ application with this court seeking review of that ruling. In an unpublished decision, this court denied the writ application, without reasons.[2] See State v. Hutchinson, 01-0704 (La.App. 1 Cir. 5/3/01). The Louisiana Supreme Court subsequently granted relator’s writ application and remanded this matter for briefing, argument, and opinion. See State v. Hutchinson, 01-1538 (La.6/28/01), 794 So.2d 803.
FACTUAL BACKGROUND
On January 10, 2000, Ja’Cory Marshall, the sixteen-month-old son of Barbara Curry, perished in a fire at Ms. Curry’s trailer in Tangipahoa Parish. The bodies of Ms. Curry, her daughter, Dotoria, and her son, Joseph, were discovered the next day in a *1123 wooded area several miles away. They had been shot to death.
Tangipahoa Parish detectives received information that relator had admitted involvement in the murders. In addition, Tangipahoa Parish detectives learned that there was an active warrant for relator’s arrest in Livingston Parish for an armed robbery and simple battery that occurred in September of 1999. On January 13, 2000, Livingston Parish officers arrested relator pursuant to that warrant. A Tan-gipahoa Parish officer may also have requested that Livingston Parish put a “hold” on relator on behalf of the Tangipa-hoa Parish Sheriffs Office. In any event, relator was arraigned and assigned a Livingston Parish public defender on the [sLivingston charges on or about January 15, 2000.
Tangipahoa Parish detectives interviewed relator several times at the Livingston Parish Jail regarding the Tangipahoa Parish murders after his arrest on the outstanding charges in Livingston Parish. It is uncontested that relator was Miran-dized each time he was questioned. Relator initially denied knowledge of, or participation in, the murders.
A few days after his arrest, relator told one of the Tangipahoa Parish detectives that he was willing to take a polygraph examination about the murders, but wanted to speak with a public defender first. Relator was in the Livingston Parish Jail at the time and was represented by a public defender on the Livingston Parish charges. In response, Captain Johnny Jones of the Tangipahoa Parish Sheriffs Office personally visited the office of the Tangipahoa Parish Chief Public Defender, .Reggie McIntyre, to relay relator’s request.
McIntyre testified he telephoned Assistant Public Defender, Tommy Frierson, in Livingston Parish, and instructed Frierson to tell relator and Pooler that the public defender’s office represented them and, unless a public defender was present, not to do anything. McIntyre also said to tell relator and Pooler that he would see them the next week. McIntyre said he told Captain Jones he was sending somebody over to the jail and, “we are on it now and that we will be representing them in this matter.”
According to Frierson’s testimony, he visited relator and Pooler at the Livingston Parish Jail and told them that he was there for Reggie McIntyre. Frierson told them the public defender’s office was representing them and that they were not to say anything or talk to the police. Frier-son did not relay this information to anyone else. Frierson later called Captain Jones to tell him he had talked to relator, who had decided not to take the polygraph. Neither McIntyre nor Frierson told Captain Jones not to discuss the murders with relator. All of this 1 occurred before relator was arrested for the murders.
Tangipahoa Parish detectives arrested and charged relator with the murders on January 27, 2000, and transferred relator to the Tangipahoa Parish Jail on that date. Relator appeared before Judge Brenda B. Ricks at about 9:00 a.m. on January 28, 2000, at which time the court appointed the public defender’s office to represent him, although there was no indication, nor does relator allege, that he requested counsel at that time.
At about 9:15 a.m. on January 28, 2000, Detectives Mark Apperson and Terry Scott went to the jail to interview relator, who was taken into an interrogation room, was' Mircmdized, and signed a waiver of rights form consenting to the interview. During the interview, relator told the detectives he wanted to see a “Reverend,” and the interrogation stopped while they located a minister. The minister spoke *1124 with relator at the Tangipahoa jail in the detectives’ presence. The record does not indicate that relator asked to speak with the minister alone. In any event, the interview with the detectives, with the minister present, resumed shortly before noon, after relator signed another waiver of rights form. However, after relator failed to make a statement, the interview ended sometime around 1:00 p.m.
James Harrell, an investigator for the public defender’s office, was at the Tangi-pahoa Parish jail on the morning of January 28, 2000, and saw relator being interviewed by Detectives Mark Apperson and Terry Scott. According to Harrell, Apper-son stated that he and Scott intended to question relator until he invoked his right to counsel. Shortly thereafter, Harrell informed Detective Scott that relator was represented by the public defender’s office. The last thing Harrell did at the jail that morning was meet with relator and Pooler, and Harrell advised them they were represented by the public defender’s office on these charges and not to make any statements or talk to anyone without their attorney present. However, Harrell |5did not tell either detective or anyone else at the jail that relator and Pooler were not to be questioned without counsel present.
Upon returning to the public defender’s office around 3:30 p.m. that same day, Harrell personally told Reggie McIntyre that relator had been arrested for the murders, was being questioned, and had asked for a minister. Harrell told McIntyre it appeared relator would soon confess to the crimes.
McIntyre testified that before relator was arrested on the murder charges, he had told Captain Jones he represented relator and Pooler, but he conceded that he had not told anyone relator was not to be questioned without an attorney. McIntyre indicated he had told relator to call him as soon as detectives approached him for questioning, and he expected relator to do so. McIntyre remained at his office the rest of the day, but never received a call. McIntyre also testified that he “assumed” relator or someone from the jail would call him before the police attempted to interview relator, because they had done so in the past when the police knew the public defender’s office had been appointed to a case.
In any event, Tangipahoa Parish detectives Chris Gideon and his brother, Kelly Gideon, reinitiated questioning of relator at approximately 3:00 p.m. the same day. They again advised relator of his Miranda rights, and he signed another waiver. After about two hours of questioning, relator gave a lengthy, unrecorded confession. After again being read his rights, relator gave a tape-recorded statement. Relator also agreed to take the police to the crime scene and the police recovered several items of evidence.
DISCUSSION
Relator argues his taped confession must be suppressed because it was taken in violation of his rights to counsel under both the Fifth and Sixth Amendments to the United States Constitution. Specifically, he contends his right to counsel was violated because, once he asked to speak with an attorney about the proposed 1 (¡polygraph examination concerning the murders, he had effectively invoked his right to counsel on those charges (even though he had not yet been arrested for them) and the police were prohibited from initiating further questioning of him outside the presence of counsel. Relator further notes that the Tangipahoa Parish Sheriffs Office was aware that the public defender’s office was representing him regarding the murder investigation from the time that Captain Jones visited the public defender’s office and spoke to McIntyre, *1125 who indicated to Captain Jones that “we” (the public defender’s office) were on the case.
It is well-settled that for a confession or inculpatory statement to be admissible, the state must affirmatively show the confession was freely and voluntarily given without influence of fear, duress, intimidation, menaces, threats, inducements, or promises. LSA-R.S. 15:451; LSA-C.Cr.P. art. 703. The state must also establish that the accused was advised of his constitutional rights under Article 1, § 13 of the Louisiana Constitution and the Supreme Court’s decision in Miranda v. Arizona, 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966), including his right to counsel. See State v. Hobley, 98-2460 (La.12/15/99), 752 So.2d 771, cert. denied, 531 U.S. 839, 121 S.Ct. 102, 148 L.Ed.2d 61 (2000).
Further, if a suspect in custody invokes his right to counsel, at any stage in the process, expressing a desire to deal with the police only through counsel, all questioning must cease, and the accused may not be subject to further interrogation without counsel present, unless the accused initiates further communication with the police and validly waives his earlier request for counsel. See Edwards v. Arizona, 451 U.S. 477, 101 S.Ct. 1880, 68 L.Ed.2d 378 (1981). See also, Minnick v. Mississippi 498 U.S. 146, 111 S.Ct. 486, 112 L.Ed.2d 489 (1990); Miranda, 384 U.S. at 444-445, 86 S.Ct. at 1612. Miranda and Edwards are prophylactic rules designed to protect an accused against the inherently compelling pressures of custodial interrogation. The purpose of these rules is to protect the |7suspect’s desire to deal with the police only through counsel. See McNeil v. Wisconsin, 501 U.S. 171, 111 S.Ct. 2204, 115 L.Ed.2d 158 (1991).
In the present case, relator agreed before his arrest on the murder charges to take a polygraph test regarding the murders, but said he wanted to first speak to an attorney about the test. After doing so, he declined to take the test. However, relator contends this request invoked his right to counsel and prohibited further police-initiated questioning outside the presence of counsel. Thus, he asserts his right to counsel was violated when the police subsequently initiated the interrogation that led to the confession at issue.
Under the Sixth Amendment of the United States Constitution, a criminal defendant has the constitutional right, unless waived, to the assistance of counsel at every critical stage of the proceedings. See State v. Flowers, 598 So.2d 1144 (La.App. 1 Cir.1992). However, the Sixth Amendment right to counsel is “offense specific” and attaches only after commencement of criminal proceedings. See Texas v. Cobb, 532 U.S. 162, 121 S.Ct. 1335, 149 L.Ed.2d 321 (2001); State v. Carter, 94-2859 (La.11/27/95), 664 So.2d 367. In the present case, although relator was charged with two unrelated offenses in Livingston Parish at the time he asked to speak to an attorney regarding the polygraph test, he had not been arrested or charged with the Tangipahoa Parish murders.[3] Therefore, no Sixth Amendment right to counsel had attached at that point with respect to the *1126 subsequent murder charges. See Cobb, 532 U.S. at 167, 121 S.Ct. at 1340; Carter, 664 So.2d at 372- 373. A defendant must invoke his right to counsel under the Sixth Amendment at |sa time when that right is available to him, and he cannot invoke it once for all future prosecutions. See Cobb, 532 U.S. at -, 121 S.Ct. at 1340; United States v. LaGrone, 43 F.3d 332, 338 (7th Cir.1994).
Furthermore, we find no merit in relator’s contention that his right to counsel was violated because the police knew the public defender’s office had been appointed to represent him following his arrest for the murders. We note that no one from the public defender’s office advised the police that relator was not to be questioned without counsel. Moreover, in the absence of an assertion of his right to counsel, the mere fact that the public defender’s office was appointed to represent relator did not prohibit the police from subsequently questioning him outside the presence of counsel. Under the Sixth Amendment, an indigent defendant who has been appointed counsel, but who has not otherwise invoked his right to counsel, can thereafter validly waive his right to counsel. See Carter, 664 So.2d at 380. A defendant’s “mere mute acquiescence in the appointment of counsel” is insufficient to constitute a general assertion of the right to counsel so as to prohibit the police’s further questioning of the defendant outside the presence of his attorney. See Carter, 664 So.2d at 383. Instead, there must be an affirmative assertion of the right to counsel, indicating a desire to deal with the police only through counsel, in order to trigger application of the rule prohibiting subsequent police-initiated interrogation of a defendant. See Carter, 664 So.2d at 383. In this case, relator did not assert his right to counsel under the Sixth Amendment at any time after that right had attached.[4]
Having concluded there is no merit in relator’s contention that his Sixth Amendment right to counsel was violated, we turn now to a consideration of his | flFifth Amendment right to counsel, as delineated in Miranda. The Supreme Court held in Miranda that, to protect the Fifth Amendment right against self-incrimination, the police must inform a suspect before custodial interrogation begins that he has, among other rights, the right to consult with an attorney and to have counsel present during custodial interrogation. Miranda, 384 U.S. at 467-472, 86 S.Ct. at 1624-1627. Further, as noted above, once a suspect in custody invokes his right to counsel, all questioning must cease, and the police may not initiate further questioning of the suspect outside the presence of counsel. See Edwards, 451 U.S. at 484-485, 101 S.Ct. at 1884-1885. Relator argues herein that his request to speak to an attorney about taking a polygraph test was an assertion of his right to counsel that, although it occurred before his arrest for murder, remained in effect even after his arrest, so that the police were prohibited from questioning him without counsel. Thus, the question presented is whether relator’s request constituted a general invocation of his right to counsel under the Fifth Amendment.
The United States Supreme Court has held that a defendant may make a limited invocation of his right to counsel for one purpose that does not automatically serve as a general invocation of his right to counsel for purposes of triggering the *1127 Edwards rule prohibiting further police-initiated interrogation of the defendant. In Connecticut v. Barrett, 479 U.S. 523, 107 S.Ct. 828, 93 L.Ed.2d 920 (1987), the Supreme Court held that a defendant’s request for counsel in the event that he had to give a written statement was limited to that situation, and did not serve as a general invocation of the right to counsel that prohibited subsequent police-initiated questioning of the defendant. Thus, such a limited invocation of the right to counsel did not preclude the admission of a statement made by the defendant that fell outside its limited scope. See Barrett, 479 U.S. at 527-530, 107 S.Ct. at 831-832. In addition, the Supreme Court has held that the prophylactic rule of Edwards applies only when the suspect has expressed a wish for the [inparticular sort of lawyerly assistance that is the subject of Miranda, requiring, at a minimum, some statement that can reasonably be construed to be an expression of a desire for the assistance of an attorney in dealing with custodial interrogation by the police. McNeil, 501 U.S. at 178, 111 S.Ct. at 2209.
In Lewis v. Miller, 220 F.3d 485 (7th Cir.2000), immediately prior to taking a polygraph test the defendant indicated he wanted to speak to a lawyer. He was then returned to the police station without taking the polygraph test. Several hours later, the police resumed interrogation of the defendant and ultimately obtained a confession from him. The appellate court adopted the lower court’s holding that the defendant’s request “was a limited - one, that pertained only to the polygraph examination itself,” rather than being a general invocation of the defendant’s right to counsel that would have prohibited further police questioning without counsel. Lewis, 220 F.3d at 489. See also United States v. Jacobs, 97 F.3d 275 (8th Cir.1996); State v. Moore, 95-116 (La.App. 3 Cir. 10/4/95), 663 So.2d 250; State v. Evans, 581 So.2d 372 (La.App. 4 Cir.), writ denied, 588 So.2d 112 (La.1991).
In the instant case, relator asked to consult with an attorney before taking a polygraph test, and he was allowed to do so. He thereafter declined to ,take the test. We conclude relator’s request was limited in scope to the proposed polygraph test and did not indicate a desire on his part to deal with the police only with the assistance of counsel. Therefore, the police were not precluded from initiating questioning of relator outside the presence of counsel. The subsequent confession relator gave to the police fell outside the scope of his limited request for counsel. Accordingly, we reject relator’s contention that his confession is inadmissible because the police violated the prohibition against initiating questioning of a defendant who has invoked his right to counsel.
Relator also contends his confession is inadmissible for the additional reason I nthat it was not voluntary and was given under duress. Specifically, he asserts the confession was involuntary because he was subjected to interrogation over a sixteen-hour period, in a small room, without food, by two successive teams of detectives. Moreover, he had been further subjected over a period of days to interrogation by at least five detectives on at least four occasions. He also contends that his arrest on the outstanding charges in Livingston Parish were a sham designed to put further pressure on him. As support for this contention, he points to the fact that trial has not been scheduled on those charges.
In Carter, 664 So.2d at 385, the Louisiana Supreme Court held that, in order to demonstrate a knowing and intelligent waiver of the right to counsel, the state must prove an intentional relinquishment of a known right, and that a confession is “voluntary only if it was the product *1128 of defendant’s uncoerced free will.” The validity of a waiver must be determined by carefully scrutinizing the particular facts and circumstances surrounding a case. Appellate courts defer to the findings of the trial judge regarding whether the confession was knowingly, intelligently, and voluntarily made, unless those findings are not supported by the evidence. See Carter, 664 So.2d at 385; State v. Lucky, 96-1687 (La.4/13/99), 755 So.2d 845, cert. denied, 529 U.S. 1023, 120 S.Ct. 1429, 146 L.Ed.2d 319 (2000). Finally, the state must specifically rebut a defendant’s specific allegations of police misconduct in eliciting a confession. See State v. Maize, 94-0736 (La.App. 1 Cir. 5/5/95), 655 So.2d 500, writ denied, 95-1894 (La.12/15/95), 664 So.2d 451.
At the suppression hearing in this case, the state offered testimony from the detectives who obtained the confession to prove that relator knowingly and voluntarily waived his right to remain silent and his right to counsel. Detective Chris Gideon, who took the statement from relator, testified he and Detective Kelly Gideon went to the jail to speak to Perry Pooler, but when they saw relator standing near the booking area, they decided to speak to him. After relator agreed \1?.to talk, they went into an interview room. Before beginning the interrogation, relator was advised of his Miranda rights, signed a rights-waiver form, and indicated he understood the rights and waived them. Detective Chris Gideon stated that relator was, in fact, re-advised of his Miranda rights several times during the interrogation and recording of the confession. Detective Chris Gideon further indicated that no one told him that relator was represented by an attorney and that relator did not indicate that he wanted an attorney or that he did not want to speak to the detectives. According to Detective Chris Gideon, relator was not coerced in any way and no promises or threats were made to him in exchange for his statement.
Detective Kelly Gideon, who was present during the interrogation and relator’s initial unrecorded statement, but left the room during the recorded statement, gave testimony in accord with Chris Gideon’s testimony on each pertinent point. Additionally, the state introduced a written waiver of rights form signed by relator at 3:09 p.m. on January 28, 2000, at the beginning of his interview with the Gideons.
Relator does not dispute the testimony of the Gideons. Further, he does not allege that he asked to see his attorney before the Gideons began questioning him, that he declined to be questioned, that he requested that questioning be stopped, or that anyone told the detectives or jail personnel that he was not to be questioned without notice to or the presence of the public defender’s office. Moreover, we note that James Harrell, the investigator for the public defender’s office, testified that he met with relator only hours before relator’s interview with the Gideons. Harrell told relator that he was represented by the public defender’s office on the murder charges and that relator was not to make any statements or talk to anyone without the presence of his attorney. Thus, the evidence presented by the state clearly indicates that relator was repeatedly advised of his rights and understood 113them at the time that he freely waived those rights and gave his confession.
Furthermore, we do not find that the confession was rendered involuntary by the circumstances complained of by relator. The evidence presented by the state sufficiently rebutted relator’s specific allegations of misconduct. First, we find no merit in relator’s contention that he was subjected to compulsion because he was interviewed on the day of his confession over a sixteen-hour period by successive teams of detectives. The evidence introduced at the suppression hearing indicates *1129 that relator was interviewed on the day he confessed by two different sets of detectives, first Detectives Apperson and Scott, then Detectives Chris and Kelly Gideon. However, there was no indication that the successive interviews were a concerted effort by the detectives to subject relator to duress, nor that they had that effect. Detectives Apperson and Scott had no memory of seeing the Gideons on the day in question, and denied exchanging informa- ' tion with them about the outcome of their interview with relator. The Gideons each testified that they went to the jail that day for the specific purpose of interviewing Perry Pooler and decided to question relator only when they happened to see him in the booking area.
The detectives’ testimony also established that, although relator was subjected to two interviews that day, the first one covered a period of not more than approximately four hours, from 9:15 a.m. until 1:00 p.m., which included a lengthy break while a minister was located. The second interview started after 3:00 p.m. After approximately two hours, relator began making an unrecorded confession, which lasted at least one and one-half hours. He then gave a recorded statement of similar length and took the police to one of the crime scenes, which accounted for the remainder of the time in the sixteen-hour period referred to by relator. Given these circumstances, we do not find that relator was subjected to interrogation for an inordinate length of time.
| uWith respect to relator’s claim that he was not given any food during his interview, the Gideons both testified that they could not remember if relator asked for food, but that they would have given him something if he had asked or indicated he was hungry. Chris Gideon further testified that relator was offered food at one point, albeit probably after the taped confession, although he may have been given something from the vending machine prior to that time. He specifically remembered that relator was given something to drink from the vending machine and was allowed an opportunity to go to the bathroom. We find this testimony was sufficient to rebut the allegation that relator was denied food. In any event, even if relator was not given any food during the interview, the period of time involved was not such that it amounted to coercion rendering his confession involuntary.
Relator’s remaining allegations are equally without merit. The mere fact that relator was interviewed by detectives on several occasions spanning a period of days does not constitute police misconduct, particularly in view of the fact that relator properly was advised of his rights on each occasion. We reach a similar conclusion with respect to relator’s complaint that his arrest on the outstanding charges in Livingston Parish was a “sham” or “pretextual arrest” to pressure him, as purportedly evinced by the fact that he has not been brought to trial on the Livingston charges. Relator does not contest the validity of the arrest warrant on those charges. Moreover, the progress of those criminal proceedings may be affected by a myriad of factors not established by the record herein, that have nothing to do with the motivation attributed by relator.
CONCLUSION
Based on our careful examination of the totality of the circumstances, we conclude relator’s confession was given freely and voluntarily, after he was properly advised of his constitutional rights and chose knowingly and intelligently to waive those rights. The state presented evidence sufficiently rebutting each of l1sthe specific allegations of police misconduct raised by relator. Accordingly, we find no error in *1130 the trial court’s denial of relator’s motion to suppress.
WRIT DENIED.

. In his original writ application, relator also sought review of the district court's denial of his motion to sever his trial from that of his co-defendant, Perry Pooler. However, in the brief he filed on remand of this matter, he does not raise any issue concerning that ruling.

. We specifically reject relator's assertion that the fact that someone in the Tangipahoa Parish Sheriff’s Office may have requested that a "hold" be placed on relator after his arrest in Livingston Parish amounted to a “de facto arrest” for the Tangipahoa Parish murders. We note that, although relator refers to the Livingston Parish charges as "dubious,” he neither raises specific allegations challenging the validity of the arrest warrant for those charges nor alleges that he posted bond on the Livingston Parish charges. Thus, irrespective of the purported "hold” requested by Tangipahoa Parish officers, the record indicates relator was held in Livingston Parish Jail pursuant to his arrest on a warrant for charges outstanding in that parish.

. The Louisiana Supreme Court held in Carter that the Sixth Amendment and Art. 1, § 13 of the Louisiana Constitution are coextensive with respect to the time the right attaches, the proceedings it applies to, and whether it can be waived. See Carter, 664 So.2d at 382 n. 15.