NO. 4-03-1018          Filed: 3/10/06

IN THE APPELLATE COURT

OF ILLINOIS

FOURTH DISTRICT

| | | |
|---|---|---|
| THE PEOPLE OF THE STATE OF ILLINOIS, | ) | Appeal from |
| Plaintiff-Appellee, | ) | Circuit Court of |
| v. | ) | Vermilion County |
| JOSHUA KRUGER, | ) | No. 99CF357 |
| Defendant-Appellant. | ) | |
| | ) | Honorable |
| | ) | Thomas J. Fahey, |
| | ) | Judge Presiding. |

_____

JUSTICE COOK delivered the opinion of the court:

In June 2003, a jury convicted defendant, Joshua Kruger, of (1) first

degree murder (720 ILCS 5/9-1(a) (West 1998)), (2) home invasion (720 ILCS 5/12-

11(a) (West 1998)), (3) residential burglary (720 ILCS 5/19-3(a) (West 1998)), and (4)

attempt (robbery) (720 ILCS 5/8-4(a), 18-1(a) (West 1998)).  In August 2003, the trial

court sentenced him to the following concurrent prison terms:  natural life for first degree

murder, 30 years for home invasion, 15 years for residential burglary, and 5 years for

attempt (robbery).  Defendant's motion to reconsider sentence was denied and he

appealed.  We affirm as modified and remand with directions.

I. BACKGROUND

On July 15, 1999, the police were called to 81-year-old Peter Godels's

home in Westville after Godels did not answer his door when a woman came to deliver

his meal.  The police found Godels dead in his bedroom.  An autopsy performed on July

16, 1999, showed Godels had 16 external injuries and died 6 to 24 hours before the

autopsy was performed from cranial cerebral injuries due to multiple blunt-force trauma.

Defendant was eventually indicted in connection with Godels's homicide for multiple counts of first degree murder (720 ILCS 5/9-1(a)(1), (a)(3) (West 1998)), home invasion, residential burglary, and attempt (robbery).

Defendant proceeded with a jury trial. Before the trial, defense counsel filed motions to suppress evidence, objecting to a search of defendant's car. The trial court granted the motion in part. The State appealed. This court found that the trial court erred in excluding the evidence. People v. Kruger, 327 Ill. App. 3d 839, 845, 764 N.E.2d 138, 142 (2002). While the appeal was pending, the State filed a new indictment that restated the charges from the original indictment but added the following counts: count XIII (victim 60 years or older), count XIV (brutal or heinous behavior), count XV (section 9-1(b)(6) aggravating factor (murder committed during forcible felony) (720 ILCS 5/9-1(b)(6) (West 1998))), and count XVI (section 9-1(b)(16) aggravating factor (the victim was over 60 and the acts were brutal or heinous) (720 ILCS 5/9-1(b)(16) (West 1998))).

At trial, the State presented Barbara Johnson, who testified that she knew defendant since she was a child. According to Johnson, defendant came to her house in July 1999. At that time, Mendi Toth, Johnson's roommate; Jeff Holmes, Johnson's boyfriend; and Earl Harris, Holmes's friend, were at Johnson's house. Johnson stated that defendant, Holmes, and Harris went to get marijuana, then came back. When the three got back, Johnson told defendant she heard that he wanted to do something illegal to make some money. Over objection by defense counsel, Johnson testified

defendant asked her if she knew where he could get a gun and she responded that she did and that she knew where they could possibly get some money. Johnson told defendant that a man named "Pete" supposedly had a lot of money. Defendant, Johnson, Holmes, and Harris drove to "Pete's" house, and Godels was standing outside. Johnson and defendant agreed that if they got any money, they would split it.

Over objection from defense counsel, Johnson testified that from Godels's house, the group went to Billee Weston's house to see about getting a gun. Weston did not give Johnson a gun. The group then went back to Johnson's and agreed to meet later when it was dark to rob Godels. Everyone returned to Johnson's when it was dark. Defendant asked if he was wearing dark enough clothes. The group smoked marijuana and then Holmes, Johnson, and defendant left for Westville in defendant's car. In the backseat of defendant's car, Johnson noticed a crowbar, masking tape, and a black ski mask. When they arrived at Godels's residence, Johnson was to go to the door because Godels knew her and would let her inside. After getting out of the car, Johnson turned around because she got scared. Defendant got mad and began hitting the dashboard of the car. Defendant eventually drove them back to Johnson's house. At Johnson's house, defendant told Johnson he would "do it with or without [her]."

Holmes testified to a similar version of events. He added that after he heard about Godels's murder, he asked defendant if he went back to Westville and defendant responded "your girlfriend's a[] *** liar" and "I killed a man for nothing." Harris also testified, and his version of the initial trip to Westville was substantially the same as Holmes's and Johnson's versions.

Edgar Newton testified that he was Godels's friend and former tenant but

had moved out before Godels was murdered. Newton knew Johnson, as well as Henry Graham, a codefendant. Gary Beauchamp testified he was Godels's friend and had built the house in which Godels was living.

Michelle Carlton, defendant's former girlfriend and mother of his children, testified that she lived with defendant in 1999. One evening in July, defendant, wearing only his boxers and undershirt, came to bed unusually quiet. Carlton asked him why he was home so early and he stated he was trying to make some quick cash by selling drugs, but he got scared and gave the drugs away. Later, Carlton noticed defendant's dark tennis shoes were missing.

Carlton further testified that after that night, they were at defendant's mother's house and defendant was in a big hurry to get home to watch the news, which was unusual. The news ran a story about a man murdered in Westville, and defendant laughed at the television and said "they don't have any leads, they don't know what they are talking about." Carlton asked defendant how he would know that, and defendant responded "they never know what they're doing." Later that evening, a man Carlton had never seen came to talk to defendant. After the man spoke with defendant, he returned panicked, saying he was going to his dad's in Maryland. When Carlton asked defendant what was wrong, he responded "I killed that man" and pointed toward the television.

Carlton also relayed a conversation she had with defendant before he was arrested in which he described how he had pounded on the dashboard in his car because he was mad that the robbery had not yielded any money.

Carlton had testified in front of the grand jury that defendant was either with her or Chad Cooper all night but admitted at trial that she had lied to the grand jury.

After Carlton testified for the grand jury, she talked to defendant at the jail, and he told her that Holmes and Johnson had told him about Godels. According to Carlton, defendant stated the plan had been that he and Holmes would rob Godels but that defendant ended up robbing Godels by himself. Defendant later told Carlton that Henry Graham had been with him and Graham hit Godels while they both demanded money. Defendant stated Graham continued to hit Godels while defendant searched the house. Defendant told Carlton he had a ski mask, crowbar, and duct tape and Graham had a gun. According to Carlton, defendant stated he burned the clothes he wore when he went to Godels's residence.

Carlton testified that defendant had a gang tattoo on his back that says "GD gang." Carlton believed defendant and Graham were in the same gang.

The State also presented defendant's grand jury testimony to the jury. Defendant's grand jury testimony indicated he had a girlfriend, Michelle Carlton, but he did not know Barbara Johnson, Jeff Holmes, Mendi Toth, or Earl Harris. Defendant claimed he never went to Westville the week Godels was killed. Further, defendant stated that the entire day and night of the murder he was either at Carlton's apartment, with Carlton, or with his best friend Chad Cooper.

The State called numerous police officers and crime scene investigators. One official testified he seized a blue knit cap, a blue hooded sweatshirt, a black and green nylon bag, a blue bandana, and blue gloves from the front passenger seat of defendant's car. The official also collected a swab of a reddish stain from defendant's car. The only fingerprints found at the victim's home belonged to Beauchamp and Newton. One forensic scientist matched a swab retrieved from defendant's car to

Godels's DNA (deoxyribonucleic acid).

Defendant called Chad Cooper, who testified that defendant was with him from around 6 p.m. to around 9 p.m. the night of the murder. Cooper also stated that defendant had asked him to arrange a visit between defendant and his children. Cooper asked Carlton, but she stated she wanted nothing to do with defendant or to "mess up" her new relationship.

The chief investigator in this case testified that he had received information from Henry Graham that defendant went to a particular area to burn his clothing from the night of the murder and that a crowbar was thrown in that area. When police searched the area, they found nothing of significance to the case. Godels was murdered in July, and the police searched the area in the winter when four to six inches of snow covered the ground.

The parties stipulated that Shawn Williams, a former tenant of Godels, moved out of Godels's residence three to five weeks before the murder. Williams knew Henry Graham and his brother but does not remember whether Henry had ever been to Godels's home.

Finally, defendant testified in his own defense. Defendant admitted that on July 13, 1999, he saw Johnson, Holmes, and Harris. Defendant claimed he was driving to see if he could buy a gun for protection and saw Holmes and Harris at Johnson's house. Holmes stated he could get a gun, so defendant, Holmes, and Harris drove to some apartments. Holmes went inside to get the gun but came back empty-handed. The group headed back to Johnson's house where they found Johnson. Johnson said she could get defendant a gun if he bought her some marijuana.

Defendant bought the marijuana. Johnson directed defendant to a trailer in Westville. Defendant drove and Johnson, Holmes, and Harris went along. When they arrived at the trailer park, Johnson stated that the guy's car was not there, so they could not get the gun. Defendant drove the group back to Johnson's house. During the drive, Johnson pointed to Godels's house and stated Shawn Williams had robbed the house and they could easily rob it. Defendant responded he did not want to have anything to do with a robbery.

Defendant claims on July 14, 1999, he went to his mother's house in the morning, Carlton later came to his mother's house, and they eventually went back to Carlton's apartment. At 6 p.m., Cooper picked him up and they went for a run, and then went to Fazoli's. Cooper dropped him back at home at 9 p.m. Defendant only left that evening to get milkshakes. Defendant remembers the day because Carlton started a new job the next day.

The day Carlton started her new job, July 15, defendant awoke and found a note from Carlton stating she would meet him at his mother's house after she got off of work. Defendant's pager went off while he was taking a shower. The page was from Holmes, who stated he had a gun for defendant at Holmes's mother's house. At the house, defendant saw Holmes and Henry Graham talking. Holmes gave defendant a gun. Graham and defendant started talking, and Graham asked defendant for a ride to the mall. Defendant took Graham to the mall and they discussed a party that was to be held that night. Defendant agreed to go with Henry Graham to the party. After the mall, defendant went to his mother's house and met Carlton. That night, he drove Graham and Tyson Jones to a bar and nightclub. After going to the nightclub, defendant went

home.

The next day, July 16, defendant noticed an article in the newspaper about a suspicious death in Westville. Defendant recognized the man as the person standing in front of the house that Johnson had said would be easy to rob. Defendant thought it was a big coincidence, so when Carlton came to his mother's after work, he told her he wanted to get home to watch the news. While watching the story about Godels, defendant told Carlton he thought he knew who killed that man. Defendant told Carlton what happened with Johnson. The two considered going to the police but decided not to because defendant was on parole.

On July 17, Holmes approached defendant and told him Johnson was blaming him for the murder in Westville. Defendant told Holmes that Johnson was a liar. Holmes asked defendant if he was going to the police, and defendant said he was not. Holmes threatened to tell the police about defendant's gun if he told the police.

A week and a half later, defendant was arrested for possession of a firearm by a felon after the police saw a gun in defendant's car when they were investigating him for Godels's murder. The police towed defendant's car. Defendant remained in jail until, according to him, he was told that he had a phone call. Instead of receiving a call, he was taken to the grand jury room and told he had to testify. At the time, he was represented for the firearms charge, but his attorney was not present at the grand jury. After the grand jury, defendant was charged with Godels's murder.

At the close of all the evidence, the State submitted two theories of first degree murder. "Type A" theorized defendant personally or by accountability performed the acts that caused the death and intended to kill or do great bodily harm, knew his

acts would cause death, or knew his acts created that strong probability. "Type B" theorized felony murder during the commission or attempted commission of home invasion, residential burglary, or robbery. Defendant was convicted of (1) first degree murder (720 ILCS 5/9-1(a) (West Supp. 1999)), "Type B," (aggravating factors age, brutal, or heinous behavior, and felony murder); (2) home invasion, (3) residential burglary, and (4) attempt (robbery).

At sentencing, the trial court orally sentenced defendant to concurrent prison terms of natural life for "Type B" first degree murder, 30 years for home invasion, 15 years for residential burglary, and 5 years for attempt (robbery). In November 2003, the court denied defendant's motion to reconsider sentence. This appeal followed.

## II. ANALYSIS

On appeal, defendant raises eight points of error. First, defendant argues that the trial court had no jurisdiction to proceed on the indictment filed when the State's appeal was still pending. In the alternative, defendant argues his natural life sentence was based on a charge for which he had been acquitted and we should remand. Next, defendant argues the court improperly allowed testimony concerning defendant's search for and possession of a gun. Also, defendant claims the court erred in denying his motion to suppress his statements to the grand jury. Further, the court acted improperly in allowing Carlton's testimony that defendant had a gang tattoo and was in a gang with Henry Graham. Defendant next claims the court committed plain error when it allowed the State to impeach him with his prior convictions for unlawful possession of a weapon by a felon and armed robbery. Defendant also argues he was denied effective assistance of counsel at his jury trial. Finally, defendant contends his natural life

sentence is grossly disproportionate to codefendant Henry Graham's sentence of 20 years.

## D. Grand Jury Testimony

Defendant argues his statements to the grand jury should have been suppressed because during the grand jury proceedings the State questioned him without his lawyer despite his previous invocations of his right to counsel and despite his previous invocations of his right to remain silent. The State responds that the admission of the testimony was harmless.

The record shows that at the hearing on the motion to suppress defendant's grand-jury statements, defendant's former attorney, Craig DeArmond, testified that he represented defendant in 1999 on the firearms charge.

The firearms charge arose because officers were sent to defendant's apartment as defendant was a suspect in the Godels murder investigation. When the officers arrived at the apartment, defendant drove up in his car. Officers recognized defendant from photographs they had seen of him, and they had information that a car matching the description of the one defendant was driving was used to travel to Godels's residence. The two officers approached the car and identified themselves as police officers. One officer saw a live round on the driver's seat, and knowing defendant to be a convicted felon, asked defendant if he was supposed to have a bullet. That officer then saw on the front driver's seat the handgrip and clip of a gun. Defendant was eventually charged with unlawful possession of weapon by a felon (720 ILCS 5/24-

1.1(a) (West 1998)).

Shortly after DeArmond was retained to represent defendant on the gun charge, he became aware that defendant was facing the possibility of an indictment for Godels's murder. DeArmond had a number of informal conversations with the State's Attorney regarding whether defendant would implicate a co-actor in the Godels murder and whether defendant would testify before the grand jury regarding the murder. DeArmond remembered the State's Attorney calling to tell him he was thinking about calling defendant at the grand jury, but DeArmond never told the State's Attorney it was all right for him to call defendant without DeArmond being present. At no time did DeArmond state defendant agreed to waive his right to have an attorney present at the grand jury. DeArmond did not receive a notice saying that defendant was going to be called before the grand jury. DeArmond knew the State had wanted to call defendant, but he did not know until after the grand jury that defendant had testified.

Section 112-4(b) of the Code of Criminal Procedure of 1963 states as follows:

> "Any person *** against whom the State's
> Attorney is seeking a Bill of Indictment
> shall have the right to be accompanied by
> counsel who shall advise him of his rights
> during the proceedings but may not parti-
> cipate in any other way. Before any testimony
> is given by such a person, he shall be in-
> formed that he has the right to refuse to

answer any question that will tend to in-

criminate him, that anything he says may be

used against him in a court of law, that he

has the right to be accompanied and advised

of his rights by counsel, and that he will

have counsel appointed for him if he cannot

afford one."  725 ILCS 5/112-4(b) (West 2000).

Before questioning defendant before the grand jury, the State's Attorney

stated as follows:

"Sir, I would advise you that you have the

right to refuse to answer any questions that

will tend to incriminate you, that anything

you say may be used against you in a court

of law.  You have the right to be accompanied

by and advised of your rights by counsel.

And if you cannot afford counsel you can have

the right to have one appointed for you."

After this admonishment, defendant answered the State's questions.

The trial court determined that defendant had been given Miranda

warnings (see Miranda v. Arizona, 384 U.S. 436, 16 L. Ed. 2d 694, 86 S. Ct. 1602

(1966)) and advised of his rights on previous occasions and that the State's Attorney

admonished him consistent with the statutory requirements.  The court determined,

therefore, that defendant was aware of his rights and "there is some onus on the

[d]efendant to exercise those rights and seek an attorney or request an attorney if he so chooses."  The court denied the motion to suppress the grand-jury statements.

Defendant was undisputedly represented by counsel on the firearms charge.  The firearms charge was initiated because defendant, a convicted felon, was found in possession of a firearm and ammunition while police were investigating defendant concerning Godels's murder.  Defendant's attorney for the firearms charge knew defendant was a suspect in Godels's murder and knew the State was thinking about calling defendant before a grand jury regarding Godels's murder.  The State, knowing defendant was represented, brought defendant from the jail where he was being held on the firearms charge, gave him a subpoena, told him he had the right to be advised by a lawyer, and questioned him under oath.  The State never informed defendant's attorney that defendant was being questioned before the grand jury even though the State had been negotiating with his attorney regarding whether defendant would testify.  These unique circumstances establish a violation of defendant's sixth-amendment right to counsel and a basis for excluding his grand-jury statements at trial.  The trial court's error in admitting the statements, though, was harmless.

The sixth amendment of the United States Constitution guarantees that in a criminal prosecution the accused shall "have the [a]ssistance of [c]ounsel for his defense."  U.S. Const., amend. VI.  In Kirby v. Illinois, 406 U.S. 682, 688, 32 L. Ed. 2d 411, 417, 92 S. Ct. 1877, 1881 (1972), the United States Supreme Court determined that the sixth-amendment right to counsel attached "only at or after the time that adversary judicial proceedings [had] been initiated."  Once the sixth-amendment right to counsel has attached and defendant has asserted his right to counsel, the prosecution

13

may not initiate an interrogation. Michigan v. Jackson, 475 U.S. 625, 635, 89 L. Ed. 2d 631, 641-42, 106 S. Ct. 1404, 1410-11 (1986). Without defendant's counsel being present, any purported waiver of counsel in that situation is invalid. Michigan v. Jackson, 475 U.S. at 635, 89 L. Ed. 2d at 641-42, 106 S. Ct. at 1410-11.

The sixth amendment's guarantee of the right to counsel is "offense specific" and "cannot be invoked once for all future prosecutions, for it does not attach until a prosecution is commenced, that is at or after the initiation of adversary judicial criminal proceedings." McNeil v. Wisconsin, 501 U.S. 171, 175, 115 L. Ed. 2d 158, 166, 111 S. Ct. 2204, 2207 (1991). In determining whether an uncoerced confession of a crime should be admissible when the confessor's sixth-amendment right to an attorney had attached for another offense, the United States Supreme Court determined that the meaning of the term "offense" in the sixth-amendment right-to-counsel context is the same as in the fifth-amendment double-jeopardy context. Texas v. Cobb, 532 U.S. 162, 173, 149 L. Ed. 2d 321, 331-32, 121 S. Ct. 1335, 1343 (2001). In Cobb, the Supreme Court noted that the ability to obtain uncoerced confessions after valid Miranda waivers is "'essential to society's compelling interest in finding, convicting, and punishing those who violate the law.'" Cobb, 532 U.S. at 172, 149 L. Ed. 2d at 331, 121 S. Ct. at 1343, quoting McNeil, 501 U.S. at 181, 115 L. Ed. 2d at 170, 111 S. Ct. at 2210.

According to the United States Supreme Court, "the core purpose of the counsel guarantee was to assure 'Assistance' at trial, when the accused was confronted with both the intricacies of the law and the advocacy of the public prosecutor." United States v. Ash, 413 U.S. 300, 309, 37 L. Ed. 2d 619, 626, 93 S. Ct. 2568, 2573 (1973). The Court recognized that today's adversary system "'involves critical confrontations of

the accused by the prosecution at pretrial proceedings where the results might well settle the accused's fate and reduce the trial itself to a mere formality.'" Ash, 413 U.S. at 310, 37 L. Ed. 2d at 627, 93 S. Ct. at 2574, quoting United States v. Wade, 388 U.S. 218, 224, 18 L. Ed. 2d 1149, 1156, 87 S. Ct. 1926, 1931 (1967). The Supreme Court of Illinois has held that "the level of prosecutorial involvement may be considered in determining whether a defendant's sixth[-]amendment right to counsel has attached" and a "defendant has a sixth[-]amendment right to counsel only if there has been significant prosecutorial involvement at the time of the questioned action or if the government has committed itself at that time to prosecute defendant." People v. Garrett, 179 Ill. 2d 239, 248, 250, 688 N.E.2d 614, 618-19 (1997).

While defendant's grand-jury testimony came before he was formally charged with Godels's murder and the firearms charge and the home invasion, residential-burglary, attempt (robbery), and felony murder charges are not the same offenses under double- jeopardy principles, defendant should not have been questioned without his attorney under these unique circumstances. In this case, defendant's retained attorney was representing him on a firearms charge that arose in the course of the investigation of Godels's murder. While defendant claimed the gun was for his own protection, substantial trial testimony established that defendant acquired the firearm in preparation for robbing Godels. Defendant's attorney on the gun charge knew defendant was a suspect in the Godels murder and was negotiating with the State regarding defendant's cooperation at the grand jury. The State knew defendant was represented yet purposefully circumvented counsel to obtain a sworn statement of defendant's involvement in the Godels case.

This is not the case of an uncoerced confession as in <u>Cobb</u>, 532 U.S. 162, 149 L. Ed. 2d 321, 121 S. Ct. 1335. Defendant did not voluntarily confess at a police station where he was being held on another charge after receiving <u>Miranda</u> warnings. Defendant was ordered to testify under oath in front of a grand jury after the brief admonishment that he had the right to be "accompanied by and advised of his rights by counsel." Defendant was ordered to testify under oath without the benefit of his attorney's advice. Defendant did not give an uncoerced confession; rather, he was confronted with the intricacies of our legal system and advocacy of the public prosecutor and ordered to give sworn testimony without the advice of his attorney. All of this was done after defendant retained counsel to advise him after he was charged and taken into custody.

While defendant's grand-jury testimony should not have been admitted, any error was harmless beyond a reasonable doubt in light of the overwhelming evidence of defendant's guilt. <u>People v. Mitchell</u>, 152 Ill. 2d 274, 326, 604 N.E.2d 877, 903 (1992). Only defendant's own testimony and that of his best friend exculpated defendant. Three of defendant's companions, however, testified consistently that defendant was looking to rob someone and he went to Godels's residence intending to rob him. Two witnesses, one of which was defendant's former girlfriend, testified that defendant admitted to killing Godels. Finally, Godels's DNA was found in defendant's car.

## III. CONCLUSION

For the reasons stated, we affirm the trial court's judgment and remand

with directions that the written judgment of sentence be corrected to show defendant was convicted of and sentenced for count VI, first degree murder, in that he without lawful justification performed the acts that caused the death of Godels while attempting to commit a forcible felony, residential burglary, in violation of section 9-1(a)(3) of the Criminal Code of 1961 (720 ILCS 5/9-1(a)(3) (West 1998)).

Affirmed as modified and remanded with directions.

TURNER, P.J., and McCULLOUGH, J., concur.