J-A09032-22

**NON-PRECEDENTIAL DECISION - SEE SUPERIOR COURT O.P. 65.37**

| | | |
|---|---|---|
| COMMONWEALTH OF PENNSYLVANIA | : | IN THE SUPERIOR COURT OF |
| | : | PENNSYLVANIA |
| Appellant | : | |
| | : | |
| | : | |
| | : | |
| v. | : | |
| | : | |
| | : | |
| CHESTER BOTCH | : | No. 1136 EDA 2021 |

Appeal from the Order Entered May 5, 2021
In the Court of Common Pleas of Monroe County
Criminal Division at No(s): CP-45-CR-0001743-2019

BEFORE:   NICHOLS, J., SULLIVAN, J., and PELLEGRINI, J.[*]

MEMORANDUM BY SULLIVAN, J.:                    **FILED AUGUST 15, 2023**

The Commonwealth appeals from the order granting the pre-trial motion to suppress recordings filed by Chester Botch ("Botch").[1]  After careful review, we reverse.

In large part the parties do not dispute the facts of this case; their disagreement lies in the application of the law to those facts.  The largely-undisputed facts are as follows.  On October 24, 2018, police responded to a report of a hanging death at Botch's house on Beartown Road in Canadensis.  *See* N.T., 7/2/20, at 22.  The responding officers saw a man later identified as Thomas Bartkovsky ("Bartkovsky") hanging from a rope in the garage,

---

[*] Retired Senior Judge assigned to the Superior Court.

[1] *See* Pa.R.A.P. 311(d).

dead from what appeared to be a suicide. *See id*. at 23. Responding officers, including Detective Ryan Venneman ("Detective Venneman"), also observed in plain view what appeared to be narcotics and drug paraphernalia throughout the house. *See id*. Officers secured the scene, and obtained a search warrant, and in the subsequent search conducted that same day recovered several packets of drugs[2] and paraphernalia and other items consistent with drug dealing, namely an "owe sheet" and several baggies in safes in Botch's bedroom. *See id*. at 23, 32-33, 64-65.

Based on previous experience, Detective Venneman, the affiant in this matter, testified that Bartkovsky's death looked suspicious. *See id*. at 23-29. Following the search that day, Detective Venneman interviewed Botch. At the conclusion of the interview also on October 24, 2018, the police took Botch into custody for a probation violation and incarcerated him at the Monroe County Correctional Facility (the "MCCF"). *See id*. at 45-52, 83.

On October 31, 2018, police arrested and charged Botch with two counts of possessing a controlled substance with intent to deliver ("PWID"), conspiracy, and other offenses[3] relating solely to the drugs recovered in his house pursuant to the search warrant on October 24, 2018, and he remained

---

[2] Testing identified those drugs as alprazolam heroin (in trace amounts), and N-ethylepentylone,. *See* N.T., 7/2/20, at 63-65.

[3] *See* 35 P.S. § 780-113(a)(16), (30), (32); 18 Pa.C.S.A. § 903.

at the MCCF. *See id*. at 51-52; N.T., 5/4/21, at 13; *see also* Complaint, 10/31/18 (the "2018 Complaint").

In the weeks after the filing of the 2018 Complaint charging Botch with PWID and related offenses for the drugs found in his home, police conducted an investigation into Bartkovsky's suspicious death. The investigation included several witness interviews, an autopsy, which included toxicology testing to determine what, if any, drugs Bartkovsky had in his system when he died. *See* N.T., 7/2/20, at 28-37.[4] On November 1, 2018, police interviewed Bartkovsky's girlfriend, who stated that Bartkovsky hanged himself on the afternoon of October 23, 2018, the day *before* police were called to the scene. On December 4, 2018, police interviewed Botch's ex-girlfriend who stated that on the day before police were called, Botch told her Bartkovsky was hanging in the garage and Botch later stated to her that he and others hung Bartkovsky. *See id*. at 33-36, 77-78, 89-91; *see also* Affidavit of Probable Cause, 6/7/19, at 10. Several confidential informants ("CI"s) contacted the police to discuss what Botch had disclosed to them about Bartkovsky's death. *See* N.T., 7/2/20, at 37-42. One CI, Jonathan Geltz,

_____

[4] Testing revealed that Bartkovsky had alprazolam, methamphetamine, tramadol, fentanyl, norfentanyl, and metabolites of cocaine and heroin in his system when he died; his death certificate listed "mixed substance toxicity" as the cause of his death. *See* N.T., 7/2/20, at 29, 59-63.

who shared a prison cell with Botch at MCCF,[5] told police he wanted to discuss what Botch had told him about Bartkovsky's death. *See id*. at 38.

On December 18, 2018, Monroe Country First Assistant District Attorney Michael Mancuso, Detective Venneman, and Detective Michael Kreischer took Geltz's statement. *See id*. at 38. Geltz said that Botch had described Bartkovsky's overdose and death and admitted he gave Bartkovsky a "hot shot" injection on the night he died and hanged his body to make Bartkovsky's death look like a suicide. *See id*. at 38-39; *see also* Geltz Statement, 12/18/18, 8-11. Two other informants also told the police that Botch said he gave Bartkovsky a shot with different drugs that killed him. *See* N.T., 7/2/20, 39-42.

In January and February 2019, Geltz wore a consensual wire to record conversations with Botch while they were incarcerated together at the MCCF, resulting in approximately forty hours of wiretap recordings over the course of multiple days. *See* Consensual Calls, N.T., 7/2/20, at 19-20, Exhibit 1. Only a small percentage of the recordings contains conversation between Botch and Geltz. *See* N.T., 7/2/20, at 19-20, 27, 102.

On June 7, 2019, at the conclusion of the police investigation of Bartkovsky's death, the Commonwealth filed a complaint (the "2019

_____

[5] Geltz met Botch for the first time at the MCCF on or about October 24, 2018. *See* Statement of Jonathan Geltz ("Geltz Statement"), 12/18/18, at 2-3.

Complaint") alleging that Botch gave Bartkovsky drugs that resulted in his death and attempted to cover up the overdose death by hanging his body. The 2019 Complaint charged drug delivery resulting in death ("DDRD"), abuse of corpse, conspiracy, criminal use of a communications facility, and tampering with evidence,[6] as well as the two counts of PWID from the 2018 Complaint. The Commonwealth then withdrew the 2018 Complaint.[7]

It is undisputed that Botch filed an omnibus pre-trial motion that, *inter alia*, requested suppression of consensually-intercepted statements he made to Geltz in January 2019 and February 2019. *See* Trial Court Opinion, 7/27/21, at 1, 5. It is also undisputed that on May 4, 2021, after a complicated procedural history that included two suppression hearings, the court's preparation of multiple opinions, and the court's direction to the parties to file supplemental briefs, the court suppressed the six recordings at issue in

---

[6] *See* 18 Pa.C.S.A. §§ 2506(a), 5510, 903(a)(1), 7512(a), 4910(1).

[7] For unknown reasons, the District Attorney re-filed the PWID charges (which were limited to the drugs seized pursuant to the October 24, 2018 search warrant) in the 2019 Complaint charging DDRD and other offenses relating to Bartkovsky's death. When the Commonwealth filed the 2019 Complaint, the 2018 PWID charges had already been filed and were procedurally ready for trial. It is also unclear why the District Attorney did not elect to put the new charges through the charging and preliminary hearing stages, proceed to the trial court and then file a motion to consolidate the separate matters before a trial court under Pa.R.Crim.P. 582.

this appeal, although it did not suppress unrecorded statements Botch made to Geltz and others.[8] **See** N.T., 5/4/21, at 53-56.[9]

The court concluded that Botch's Sixth Amendment right to counsel on the 2018 Complaint charges attached to the charges in the 2019 Complaint as well because the 2019 Complaint included the prior PWID charges. **See id**. Despite the facts that the PWID charges concerned only the drugs found in Botch's house after the victim's death, not drugs he allegedly gave Bartkovsky, that a DDRD conviction does not require a PWID conviction, and that the DDRD and the other non-PWID charges in the 2019 Complaint were **uncharged** at the time of recordings, the court barred the use of the recordings at trial. **See id**.; **see also** Trial Court Opinion, 7/27/21, at 14, 16.

The Commonwealth timely appealed, and both it and the suppression court complied with Pa.R.A.P. 1925.

> The Commonwealth presents the following issue for our review:
>
> Did the trial court err by suppressing recorded statements of [Botch] intercepted by Jonathan Geltz at the [MCCF] when the subject matter of said recordings was conduct[ed when Botch] was not yet charged with, and, therefore, did not yet have a Sixth Amendment right to counsel?
>
> Commonwealth's Brief at viii.

---

[8] Neither the trial court nor either of the parties identifies the six recordings with particularity.

[9] The trial court's order also makes this distinction noting that "[t]his ruling applies only to matters that were intercepted and recorded" by the CI. **See** Order, 5/4/21.

Our standard and scope of review in a Commonwealth appeal from a suppression order is as follows:

We consider only the evidence from the defendant's witnesses together with the evidence of the prosecution that, when read in the context of the entire record, remains uncontradicted. This Court must first determine whether the record supports the factual findings of the suppression court and then determine the reasonableness of the inferences and legal conclusions drawn from those findings. In appeals where there is no meaningful dispute of fact, as in the case *sub judice*, our duty is to determine whether the suppression court properly applied the law to the facts of the case.

*Commonwealth v. Champney*, 161 A.3d 265, 271 (Pa. Super. 2017) (*en banc*) (internal citation omitted).

The Sixth Amendment to the United States Constitution provides that "[i]n all criminal prosecutions, the accused shall enjoy the right . . . to have the Assistance of Counsel for his defense" and guarantees him the right to have counsel present at all critical stages of the criminal proceedings. *Commonwealth v. Cox*, 983 A.2d 666, 680 (Pa. 2009) (internal citation and quotations omitted).[10] The Sixth Amendment right to counsel attaches at the initiation of formal judicial proceedings against an individual by way of formal charge. *See Commonwealth v. Hannibal*, 156 A.3d 197, 212 (Pa. 2016). After the right attaches, the police may not deliberately elicit a statement from a defendant on the offense to which it attaches unless the defendant waives the right. *See id*. "Deliberate elicitation" includes instances when the

---

[10] An accused's Fifth Amendment right to counsel is not at issue in this appeal.

government "deliberately and designedly set[s] out to elicit information from an individual" through the use of an informant acting as a government agent. *Commonwealth v. Briggs*, 12 A.3d 291, 324-25 (2011) (internal citation, quotation, and brackets omitted); *see also Hannibal*, 156 A.3d at 212.

The Sixth Amendment right to counsel is "offense specific": even when it has attached for a charged offense, it does not bar questioning on *uncharged* offenses, even if those offenses are "factually related" to the charged offense. *See Texas v. Cobb*, 532 U.S. 162, 164, 167-78 (2001); *accord Cox*, 983 A.2d at 680 (stating that under Pennsylvania law the Sixth Amendment is offense specific).[11]  Thus, the Sixth Amendment only bars questioning concerning an uncharged crime if that crime is "the same offense" under the test set forth in *Blockburger v. United States*, 284 U.S. 299, 304 (1932), which examines whether: (1) the uncharged crime arose from "the same act or transaction" and (2) whether the charged crime and the uncharged crime "require[] proof of a fact which the other does not." *See Cobb*, 532 U.S. at 173.  A mere overlap in proof between two crimes will not establish a violation of the *Blockburger* test.  *See Commonwealth v. Jackson*, 10 A.3d 341, 345 (Pa. Super. 2010).

---

[11] *Cobb* rejects prior lower courts' interpretation of *McNeil v. Wisconsin*, 501 U.S. 171 (1991), as containing an exception to the offense-specific nature of the Sixth Amendment for crimes that are "factually related" to a charged offense. *See Cobb*, 532 U.S. at 168.

Here, the parties agree that the Sixth Amendment analysis in **Cobb** is instructive. **Cobb** states that where the statement at issue involves facts specific to **uncharged** crimes it is irrelevant that the offenses are "closely related factually to the offense charged." **Cobb**, 532 U.S. at 167-68. Thus, if recorded statements involve information about crimes not then charged, the statements should not be suppressed because the Sixth Amendment right to counsel only applies to **charged** conduct regardless of the similarity of facts (or overlapping facts). **See id**. at 168.

When law enforcement officials met with Geltz in December 2018, as a result of his offer to provide information concerning Bartkovsky's death, Botch had been charged with PWID and related offenses concerning the drugs and drug paraphernalia seized from his house on October 24, 2018. **See** 2018 Complaint, at 8. Although there was an ongoing investigation into Bartkovsky's death, Botch had not been charged with offenses relating to that death in January and February 2019, when Geltz recorded conversations with him in prison. Charges related to Bartkovsky's death were not filed until June 7, 2019.

Geltz's and Botch's recorded conversations concerned Bartkovsky's death and the facts surrounding it; Geltz did not ask Botch about the search warrant, any of Botch's general drug-dealing activity, or any of the offenses charged in the 2018 Complaint. In their briefs, the parties identified relevant segments of the intercepted recordings, all of which are limited to information

surrounding the victim's death. *See* Commonwealth's Brief at xii; Botch's Brief at 5-6.[12] Further, in the recorded conversations, Geltz did not seek or elicit any information about Botch's involvement in a larger drug-dealing operation or information regarding the charges in the 2018 Complaint. Thus, under the *Cobb* test, the Sixth Amendment right to counsel did not attach because the recorded statements at issue relate to *uncharged* crimes. Accordingly, the recorded conversations should not have been suppressed. *See Cobb*, 532 U.S. at 168.

In its Rule 1925(a) Opinion, the trial court noted its continued reliance on *Maine v. Moulton*, 474 U.S. 159 (1985), and ultimately reasoned that the facts of this case were "on all fours with *Moulton*" and not factually similar to *Cobb*. *See* Trial Court Opinion, 7/27/21, at 16. Based on the perceived similarity of this case to *Moulton*, the court suppressed the intercepted conversations. *See id*. at 13-20. The court also stated that DDRD and PWID are the same offense. *See id*. at 20-21.

We conclude that the trial court erred in relying on *Moulton* and determining that PWID and DDRD are the same offense. First, *Moulton* is readily distinguishable from this case. In *Moulton*, the recorded statements

---

[12] On appeal, Botch specifically identifies recordings in which he said he overdosed Bartkovsky first and then "strung him the f*** up;" discussed the air compressor Bartkovsky stood on to hang himself; asserted that "something fishy happened" but he had nothing to do with it; said he gave Bartkovsky drugs but never identified them; and that Bartkovsky hanged himself. *See* Botch's Brief at 5-6.

at issue were obtained by Moulton's co-defendant, Colson, in a matter that was about to go to trial and involved their conversations strategizing and preparing for a joint trial on **charged** theft crimes. **See Moulton**, 474 U.S. at 162-63. Further, the police knew that the men were meeting to discuss pending charges and plan trial strategy. **See id**. at 176-77. Thus, the police's purpose was to record statements between the parties about charged crimes and obtain admissions from the defendant about charged crimes.[13] There is no evidence in the record that police encouraged Geltz to ask Botch about the 2018 Complaint and/or the PWID charges therein.

Additionally, in **Moulton**, the Supreme Court recognized that it is proper to continue investigations of criminal activities "even though the defendant ha[s] already been indicted." **Id**. at 179. Significant to this case, the Court drew a clear distinction between questioning about charged crimes and uncharged crimes: although it stated "[i]n seeking evidence pertaining to pending charges . . . investigative powers are limited by the Sixth Amendment . . .." **id**. at 179-80, it recognized, "[o]n the other hand, to exclude evidence pertaining to charges as to which the Sixth Amendment right to counsel had not attached at the **time the evidence was obtained, simply because other charges were pending at th[e] time**, would unnecessarily frustrate

---

[13] Nothing in the facts shows that police were investigating additional and/or uncharged crimes; the recordings showed that the police encouraged the co-defendant to elicit Moulton's admission concerning the charged crimes.

the public's interest in the investigation of criminal activities." ***See id***. at 180 (emphasis added).

There can be no dispute here that Geltz and Botch were not co-defendants and not preparing for an upcoming joint trial as in ***Moulton***. They only met for the first time when both were incarcerated for unrelated criminal matters at MCCF in October 2018. ***See*** Geltz Statement, 12/18/18, at 2-3. Further, when police met with Geltz they only discussed what Botch already related to him. No evidence was presented that Geltz discussed with Botch the already-charged PWID crimes. In fact, the two transcripts of discussions between police and Geltz contain absolutely no instruction to Geltz to ask about anything. Specifically, the police never encouraged him to ask about the PWID charges in the 2018 Complaint. ***See*** Geltz Statement, 12/18/19; Geltz Statement, 1/25/20. In the small portion of the recordings that constitute conversations between Botch and Geltz, Geltz limited his discussions with Botch to the facts surrounding Bartkovsky's death. Botch does not claim that Geltz asked him about his alleged drug dealing in general or the drugs that formed the basis for the 2018 PWID charges in particular. Thus, ***Moulton*** is not similar procedurally or factually to the case *sub judice* where the uncontroverted evidence is that the purpose of recording the statements between Geltz and Botch was to obtain information regarding the ***uncharged*** crime of DDRD.

There is also no legal basis to interpret the PWID charges in 2018 Complaint and refiled in 2019 Complaint as same offenses as DDRD. In **Cobb**, the Supreme Court stated that "where the same act or transaction constitutes a violation of two distinct statutory provisions, the test to be applied is . . . whether each provision requires proof of a fact which the other does not." **See Cobb**, 532 U.S. at 173 (citation omitted). Under this test, PWID and DDRD are plainly not the same offense.

The crime of DDRD has two elements: (i) intentionally administering, dispensing, delivery, giving, prescribing, selling or distributing any controlled substance, and (2) death resulting from the use of that drug. **See**, **Commonwealth v. Kakhankham**, 132 A.3d 986, 991-92 (Pa. Super. 2015); **see also Commonwealth v. Peck,** 242 A.3d 1274, 1281 (Pa. 2020) (stating that "a violation of one of the specifically referenced provisions of the Drug Act[14] is an element of the crime of DDRD."). A "violation" is distinct from a charge (or a separate conviction). **See Commonwealth v. Magliocco**, 883 A.2d 479, 489-92 (Pa. 2005) (holding that a statute that requires the commission of another offense does not require a charge of the commission of that offense).[15] PWID, on the other hand, requires only the intentional

---

[14] **See** 35 P.S. 780-113(a)(13), (14), (30).

[15] **Compare Commonwealth v. Caine**, 683 A.2d 890, 892 (Pa. Super. 1996) (*en banc*) (holding that the offense of the offense of homicide by vehicle while driving under the influence ("HVDUI") requires a **conviction** of driving under
*(Footnote Continued Next Page)*

possession of a controlled substance with the intent to deliver that controlled substance in violation of the Controlled Substance Act. **See e.g.**, **Commonwealth v. Roberts**, 133 A.3d 759, 767 (Pa. Super. 2016).

DDRD thus has an element that PWID does not, *i.e.*, the death of a person to whom a controlled substance was administered, dispensed, delivered, prescribed or sold. **See** 18 Pa.C.S.A. § 2506(a); **Kakhankham**, 132 A.3d at 992-993 (stating that the first element of DDRD, *i.e.*, a delivery or administration, requires intentionality and the second element requires, *inter alia*, reckless disregard of death). Likewise, this Court held that DDRD requires an intentional act in providing the contraband **and** a reckless disregard of death resulting from the use of the contraband. **See** **Commonwealth v. Carr**, 227 A.3d 11, 16-17 (Pa. Super. 2020) (emphasis added). The DDRD statute, however, does not require a separate charge of PWID. **See** 18 Pa.C.S.A. § 2506 (establishing that the offense is committed by a person who violates the Controlled Substance, Drug, Device and Cosmetic Act ("Controlled Substance Act") where another person dies as a result of using the substance). That the DDRD statute requires an **act** that violates the Controlled Substance Act does not mean that a PWID **charge** is an element of a DDRD conviction or that they are the same crime. Thus, an additional PWID charge is not an element of a DDRD charge. Pursuant to **Cobb**, DDRD

_____

the influence ("DUI"), and that an acquittal of the predicate crime of DUI renders the evidence of HVDUI insufficient).

is separate and distinct from PWID and was uncharged at the time of the CI's recorded statements with Botch.

Pursuant to **Cobb**, DDRD is separate and distinct from PWID. At the time of Geltz's consensual wires in January and February 2019, DDRD was uncharged. It is irrelevant that in Geltz's de-briefing, he said that Botch had asserted that he gave Bartkovsky drugs from a stash stamped "Death Row," which was stamped on drug packets found in Botch's house during the execution of the search warrant. Geltz's initial interaction with Botch occurred in prison, prior to any police involvement. **See** Geltz Statement, 12/18/18. As noted, the recordings disclose no evidence that (1) Geltz inquired about the drug packaging, or (2) Botch mentioned how the drugs were packaged. The information on the recordings does not establish that Geltz inquired about the 2018 PWID charges. Geltz's conversations were limited to the facts surrounding Bartkovsky's death.

There is yet another, independent basis for concluding that Geltz's discussions of Bartkovsky's death with Botch did not violate Botch's Sixth Amendment right to counsel. The Commonwealth alleges that Bartkovsky's death resulted from drugs in his system on October 22, 2018, and October 23, 2018, which formed the basis of the DDRD charge. There is no dispute that the drugs that formed the basis the PWID charges in both the 2018 Complaint and the 2019 Complaint concerned the drugs police found when they were called to Botch's house on October 24, 2018, and the drugs they

seized later that day pursuant to a search warrant. *See* Trial Court Opinion, 7/27/21, at 2-4. The police did not know what drugs, if any, were in the victim's body – they learned that later as a result of a toxicology report and thus those drugs could not have been the basis of the PWID charges in the 2018 Complaint. Further, by October 23, 2018, according to several witness accounts, Bartkovsky was dead. Thus, Bartkovsky could not have used the drugs recovered on October 24, 2018. The search warrant executed on October 24, 2018 recovered different drugs than those that were the basis of the **2019 DDRD charge**, even though the type of drug was the same. Botch's alleged provision of the drugs to the victim that resulted in the victim's death occurred on October 22, 2018, and October 23, 2018, and constituted the completed offense of DDRD, **before** occupants of the house summoned the police on October 24, 2018, to report the victim's death and before the police discovered drugs in the house on October 24, 2018. Because the DDRD charge related to different drugs than those that formed the basis of the PWID charges, questioning about the DDRD-related drugs did not address a previously-charged offense and did not violate the Sixth Amendment.

In sum, while it is unclear from a procedural perspective exactly why the Commonwealth elected to file the DDRD charge in the 2019 Complaint along with re-charging the PWID charges originally charged in the 2018 Complaint, this perplexing decision does not change the uncontroverted facts of record that: (1) the 2018 Complaint charged two counts of PWID specifically

related to the drugs and drug paraphernalia found at the home pursuant to the October 24, 2018 search warrant; (2) Geltz obtained the consensually-intercepted statements in January and February 2019 and Botch's statements only related to the death of Bartkovsky; (3) law enforcement did not encourage Geltz to discuss the PWID charges in the 2018 Complaint; and (4) the separate crime of DDRD remained uncharged until June 7, 2019. Thus, under **Cobb**, it is clear that the wiretap recordings at issue involved conversations for a different offense than previously charged. *See Cobb*, 532 U.S. at 173.

For all of those reasons, we conclude that the Commonwealth did not violate Botch's Sixth Amendment right to counsel and the court erred in suppressing the recorded conversations between Geltz and Botch. Accordingly, we reverse the trial court's order.

Order reversed. Case remanded. Jurisdiction relinquished.

Judge Nichols joins this memorandum.

Judge Pellegrini files a dissenting memorandum.


Judgment Entered.

Joseph D. Seletyn, Esq.
Prothonotary


Date: <u>8/15/2023</u>